2003 SD 15

**Timothy James DURAN, Plaintiff and Appellant,**

v.

**Cheryl Kay DURAN, Defendant and Appellee.**

**No. 22405.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 13, 2003.

Decided Feb. 12, 2003.

---

Ellie M. Vandenberg, VandenBerg Law, Volga, South Dakota, Attorney for plaintiff and appellant.

Richard L. Johnson, Sioux Falls, South Dakota, Attorney for defendant and appellee.

ZINTER, Justice.

[¶ 1.] On March 2, 2001, Cheryl Duran and Timothy Duran entered into a Stipulation and Agreement for a divorce. The Stipulation and Agreement divided the parties' property and debt. Most of the marital estate subject to division was invested in Enron Corp. stock, which was held in Timothy's employer's stock and savings plans (the Plans). Under the Agreement, Cheryl was to receive her share of the marital property from the Plans. Timothy also wished to satisfy his liability for the marital debt from the Plans. However, Timothy could not withdraw the stock without a significant tax penalty. Consequently, the parties agreed that Cheryl would withdraw $38,000 from the Plans, and she would then apply that money to Timothy's share of the marital debt. A Judgment and Decree of divorce and a Qualified Domestic Relations Order (QDRO)[1] were entered incorporating these agreements. However, between the time Timothy's employer segregated the Plans assets for Cheryl and the time Timothy's employer permitted Cheryl to make the withdrawal, the Enron Corp. stock suffered a precipitous decline in value. Cheryl subsequently refused to use her separate assets to pay Timothy's $38,000 share of the marital debt. Cheryl also moved the trial court to require Timothy to make up the loss she suffered in the value of her property award. At the same time, Timothy moved the court to require Cheryl to pay his full $38,000 share of the marital debt. The trial court denied both requests. Instead, it required Timothy and Cheryl to each bear the respective losses they incurred from the decline in the value of the stock. Timothy appeals contending that the Stipulation and Agreement, and the QDRO, required Cheryl to absorb any loss in value of the stock that was allocated to her by Timothy's employer for satisfaction of his share of the marital debt. We disagree and affirm the trial court.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] Timothy and Cheryl were divorced by judgment entered on March 14, 2001. A March 2, 2001 Stipulation and Agreement was incorporated into the Judgment and Decree. The Stipulation and Agreement provided for Cheryl's

---

1. QDROs are a part of the Employment Retirement Income Security Act (ERISA). *See* 29 USC § 1001 *et seq.* They facilitate the distribution of pensions and employee benefits that are subject to its provisions. Under 29 USC § 1056(3)(B):

   [T]he term "qualified domestic relations order" means a domestic relations order— which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and ... the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and is made pursuant to a State domestic relations law.

property award and Timothy's satisfaction of marital debt. It provided in relevant part:

1. [Timothy] and [Cheryl] agree that [Cheryl] shall receive the sum of $206,280.17 from [Timothy's] stock plans and savings plans. The parties agree that a Qualified Domestic Relations Order shall be entered by the Court which would require the transfer of said amount in to the ownership of [Cheryl].

The parties agree that [Cheryl] shall also withdraw an additional amount in the sum of $38,000 from [Timothy's] stock plans and savings plans. The funds shall be applied to the following debts *and is considered payment of said debts by [Timothy] for his share of said debts:*

Savings loan with Enron

Ready Cash account at Wells Fargo

IRS tax bill

AVCO loan

Mellon Mortgage—second mortgage

Loan on the 1987 Mercury Sable

(emphasis added.)

[¶ 3.] Pursuant to this Stipulation and Agreement, a Judgment and a QDRO were filed. The QDRO, dated March 26, 2001, followed the parties' agreement, but it lumped together Cheryl's property award ($206,280) and Timothy's debt obligation ($38,000) for a total of $244,280. It then ordered a segregation of this amount (one-half from each of Timothy's Plans) into a separate account in Cheryl's name. The QDRO provided:

[Cheryl] is awarded the following interest as [her] sole and separate property:

The sum of One Hundred Twenty Two Thousand, One Hundred Forty Dollars ($122,140.00) of Enron Corp. Employee Savings Plan and the sum of One Hundred Twenty Two Thousand, One Hundred Forty Dollars ($122,140.00) of the Enron Corp. Employee Stock Ownership Plan is hereby ordered assigned and transferred into and segregated into a separate account by the Plan Administrator of the Savings Plan and from ESOP solely in the name of [Cheryl] for [Cheryl's] sole and exclusive benefit, together *with all earnings thereon* from the date the separate account is established for [Cheryl] to the valuation date preceding the date of distribution to [Cheryl].

(emphasis added.)

[¶ 4.] Thus, under the terms of the QDRO and the parties' Stipulation, Cheryl was to receive a total of $244,280 in Plan assets ($206,280 for her property award, plus $38,000 to satisfy Timothy's marital debt). However, for reasons not material to this case, Cheryl was not permitted to withdraw those assets from the Plans until May 24 or 25, 2001. In that two month delay, the Enron Corp stock suffered a precipitous decline in value, and Cheryl only received $186,987.82. Because of this $57,292 decline in value, Cheryl refused to pay Timothy's $38,000 in marital debt.

[¶ 5.] Timothy responded by filing a Motion to Enforce Terms of Stipulation and Agreement. He argued that because the assets had been segregated in Cheryl's name, she should pay Timothy's full share of the $38,000 in marital debt that she had agreed to pay for him from the Plans. Cheryl was also displeased with her loss, and she filed a Motion to Set Aside Portions of Judgment and Decree of Divorce, and the Stipulation and Agreement, or to grant her alternative relief. She argued that she should not incur losses from the decline in value of her property award and the assets available for Timothy's debt obligation. After several hearings, the trial court denied both parties' motions. The trial court construed the Stipulation and

Agreement to require each party to bear the risk of loss for the decline in value of the stock. Under this ruling, Cheryl was required to bear the loss from the decline in value of her property award, and Timothy was required to bear the loss from the decline in value of the assets allocated to satisfy his share of the marital debt.

[¶ 6.] Timothy appeals the trial court's order requiring him to incur that loss and satisfy his full $38,000 share of the marital debt: The sole issue on appeal is:

> Whether the trial court erred in its construction of the parties' Stipulation and Agreement and the QDRO, which construction required each party to bear their respective risk of loss from the decline in value of the assets allocated to satisfy their shares of marital property and debt.

### STANDARD OF REVIEW

[¶ 7.] "Contractual stipulations in divorce proceedings are governed by the law of contracts." *Pesicka v. Pesicka*, 2000 SD 137, ¶ 6, 618 N.W.2d 725, 726 (citing *Houser v. Houser*, 535 N.W.2d 882, 884 (S.D.1995)). Because the interpretation of a contract is a question of law, we review it de novo. *Id.* (citing *Hayes v. Northern Hills General Hosp.*, 1999 SD 28, ¶ 62, 590 N.W.2d 243, 254).

### DECISION

[¶ 8.] Timothy raises two arguments on appeal. He first argues that the trial court erred in interpreting the parties' Stipulation and Agreement to require him to bear the risk of the loss in value of the $38,000 in stock that had been allocated for his share of the marital debt. Timothy also argues that under the terms of the QDRO, the risk of loss transferred to Cheryl as soon as the account was segregated by the employer. Timothy therefore concludes that the trial court had no authority

to modify the QDRO. We disagree with both arguments.

### Interpretation Of The Agreement

[¶ 9.] In interpreting the parties' agreement, it is well-settled that we "must seek to ascertain and give effect to the intentions of the parties." *Pesicka,* 2000 SD 137, ¶ 9, 618 N.W.2d at 727 (quoting *Singpiel v. Morris,* 1998 SD 86, ¶ 10, 582 N.W.2d 715, 718). The parties' intentions are determined by "look[ing] to the language the parties used." *Id.* "If that intention is clearly manifested by the language of the [Stipulation and Agreement], it is the duty of the court to enforce it." *Id.* (citing *In Re Estate of Stevenson,* 2000 SD 24, ¶ 14, 605 N.W.2d 818, 821). However, if the agreement is ambiguous, the rules of construction apply. *Pesicka.* 2000 SD 137, ¶ 6, 618 N.W.2d at 726 (citing *Alverson v. Northwestern Nat. Cas. Co.,* 1997 SD 9, ¶ 8, 559 N.W.2d 234, 235). Here, the Stipulation was silent on the allocation of gains or losses from market fluctuations.

[¶ 10.] Therefore, the trial court was required to interpret the parties' agreement. It reasoned:

> I think she bears that risk [for her property award] equally with him as to the stock market decline ... But as this $38,000, it looks to me like the spirit and intent of this, was that she was just going to withdraw $38,000 of his money to pay his share of the marital debts. Now, he bears the burden, also, for a decline in the stock market, just like she does. And I don't see if she was doing this, and if the parties agreed to this just as a tool or a facility, to accomplish him paying his share of the marital debt without having to incur a penalty on his retirement withdrawal, and I don't know if it is fair to burden her with a decline

in the stock market as to that amount, because it was really his money.

We agree with the trial court's reasoning.

[¶ 11.] The Stipulation and Agreement clearly stated that Cheryl was to receive two amounts: $206,280.17 for her share of the marital property; and $38,000 for *Timothy's share* of the marital debts. This emphasized language of the agreement indicates that the parties intended that Timothy was responsible for a $38,000 share of marital debt. To facilitate that payment of that obligation, and to avoid adverse tax consequences for Timothy, the parties agreed that Cheryl would withdraw the $38,000 share by use of a QDRO. There is, however, no language in the agreement that suggests Timothy's obligation for marital debt would be relieved or reduced if the marital assets declined in value before they could be withdrawn from the Plans. Therefore, Timothy remained responsible to ensure that *his* $38,000 obligation for marital debt was satisfied. We agree with the trial court that if the stock necessary to realize $38,000 for Timothy's share of the marital debt declined in value before it could be withdrawn, Timothy bore the risk of that loss, just as Cheryl bore the risk of loss for the decline in value of her property award.

■ [¶ 12.] This conclusion is warranted because the value of marital property and debt is not absolutely fixed to a certain point in time. In divorce proceedings, the date of valuation of the marital estate is generally the date of the granting of the divorce. However, a different date may be used if special circumstances are present. *Geraets v. Geraets,* 1996 SD 119, ¶¶ 8–9, 554 N.W.2d 198, 200. *See also Miller v. Miller,* 83 S.D. 227, 232, 157 N.W.2d 537, 540 (1968). This case presents such special circumstances. The clear language of the parties' Stipulation and Agreement required Timothy to satisfy $38,000 in marital debt. However, he chose to satisfy that obligation by use of Plan assets and a QDRO. When the value of the stock in the Plans declined during the two months necessary to distribute the stock, neither Timothy nor Cheryl received the full amount of money that they originally contemplated at the time of the granting of the divorce. Thus, the trial court acted within its discretion in essentially adjusting the valuations so that Cheryl would not incur sole responsibility for the risk of loss arising from a decline in value of the assets Timothy desired to use to satisfy his marital debt.

### Qualified Domestic Relations Order

[¶ 13.] Timothy also argues that the language of the QDRO mandated that Cheryl should bear the risk of loss from the decline of the value of the stock allocated to marital debt. He further argues that the trial court was without power to interpret the QDRO differently. Timothy specifically contends that as soon as the stock was segregated by the employer, each separate account was subject to its own "earnings and *losses.*" We find no support for these arguments in the QDRO.

■ [¶ 14.] First, while the express language of the QDRO does contain language allocating "interest and *earnings*" to each parties' separate accounts, the QDRO does not contain language allocating any *losses* or decreases in the value of stock. Although a letter from the employer indicated that employer intended to allocate both gains and losses, that letter is not a part of the QDRO or the agreement of the parties. Therefore, it was not binding on the circuit court. We see nothing in the language of the QDRO that required Cheryl to bear the risk of loss of value in the assets Timothy allocated to satisfy his marital debt.

[¶ 15.] Furthermore, even if the original language of the QDRO suggested such a result, courts do have the power and authority to interpret and construe the terms of a QDRO or pension in accordance with the parties' stipulations.[2] *Jackson v. Jackson,* 2002 OK 25, ¶ 18, 45 P.3d 418, 427–28 (holding that the trial court had the authority to interpret the divorce decree and revise a QDRO even after two previous QDROs were entered). Moreover, in *Washington v. Washington,* 2000 WI 47, ¶ 4, 234 Wis.2d 689, 692, 611 N.W.2d 261, 263, the Wisconsin Supreme Court held that a "circuit court may construe the final division of property in a divorce judgment" and allocate pension appreciation and interest [that accrues between the divorce and the distribution] "when the divorce judgment is silent about the allocation of appreciation." Timothy's case is no different except for the fact that it involves an allocation of pre-distribution losses instead of gains. We conclude that the trial court was well within its power, authority and discretion in interpreting the provisions of the Stipulation and the QDRO such that both parties bore their respective risk of market losses.

[¶ 16.] Affirmed.

[¶ 17.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP and MEIERHENRY, Justices, concur.

---

2. "Interpretation" and "construction" are different than "modification" of the original stipulation and judgment awarding property. "It is the settled law of this state that the division of property pursuant to a divorce decree is not subject to modification." *Sjomeling v. Sjomeling,* 472 N.W.2d 487, 489 (S.D.1991) (citations omitted). "Absent fraud or some other reason which would apply to any judgment, a divorce decree which incorporates a property settlement agreement is a final and conclusive adjudication and is not subject to later modification." *Beermann v. Beermann,* 526 N.W.2d 127, 129 (S.D.1995) (citing *Jeffries v. Jeffries,* 434 N.W.2d 585, 588 (S.D.1989)) (citing *Blare v. Blare,* 302 N.W.2d 787, 790 (S.D.1981)).