#27179-aff in pt, rev in pt & rem-SLZ

**2015 S.D. 40**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

PATRICK NICKLES,                                     Plaintiff and Appellant,

    v.

KACIE JO MARTA NICKLES,                      Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE WARREN G. JOHNSON
Retired Judge

\* \* \* \*

PATRICIA A. MEYERS
Rapid City, South Dakota

    and

CASSIDY M. STALLEY of
Banks, Johnson, Kappelman &
  Becker, PLLC
Rapid City, South Dakota                          Attorneys for plaintiff
                                                 and appellant.


DEBRA D. WATSON
Rapid City, South Dakota                          Attorney for defendant
                                                 and appellee.

\* \* \* \*

                                                 CONSIDERED ON BRIEFS
                                                 ON MARCH 23, 2015
                                                 OPINION FILED **06/03/15**

#27179

ZINTER, Justice

[¶1.]        Patrick and Kacie Nickles divorced.  Patrick appeals the circuit court's

decisions on child custody, child support, rehabilitative alimony, property division,

and attorney's fees.  We affirm the circuit court's decision on child custody.  On all

other issues, we reverse and remand for the entry of findings sufficient to permit

appellate review.

*Facts and Procedural History*

[¶2.]        Kacie and Patrick met through an online dating service in November

2003.  At the time, Patrick was living in Oklahoma with his son M.N.  Kacie and

her son J.N. moved to Oklahoma to live with Patrick.  Kacie and Patrick married in

August 2004.  During the marriage they had two additional children, B.N. and C.N.

Kacie and Patrick also adopted each other's children.

[¶3.]        Prior to the marriage, Patrick was employed by Nickles Machine

Corporation.  He later inherited a share of the business.   The business was sold in

2001, and Patrick's share of the proceeds was approximately five million dollars.

He used the sale proceeds to begin a career as an investor.  Two of his investments

involved interests in Podo Technology and Fast Fusion.  Patrick formed ROIC LCC,

a holding company, to manage his investments.  The remainder of the sale proceeds

was set aside for personal use and living expenses.  This financial arrangement

allowed Kacie to stay at home and raise the children.

[¶4.]        Patrick and Kacie initially lived an extravagant lifestyle.  In 2007,

however, the parties' financial condition changed.  Patrick's investments were not

doing well, and the family moved to Atlanta to salvage the situation.  Kacie began

abusing alcohol. In 2010, Kacie was arrested and convicted of driving under the influence of alcohol. Both parties were unfaithful during their marriage.

[¶5.] In February 2012, Patrick decided to do something about his family's financial situation and moved to Spearfish where Kacie's parent's lived. He attempted to start a business in the oil fields in North Dakota. Kacie and the children remained in Atlanta to finish the school year. In May, Patrick moved the children to Spearfish. Kacie remained in Atlanta, traveled to California with friends, and eventually rejoined her family in Spearfish. During the summer of 2012, Kacie returned to Atlanta where she worked until December 2012, when she moved back to Spearfish.

[¶6.] On April 11, 2013, Patrick filed for divorce. The parties continued to live together until an incident on April 27, 2013, when Kacie, in an intoxicated state, was arrested for assaulting her father, her sister, and Patrick. Kacie was indicted on three counts of simple assault/domestic violence. She pleaded guilty to disorderly conduct. Patrick obtained a one-year protection order against Kacie. Patrick also took custody of all four children. On May 3, 2013, Kacie began residential alcohol treatment in California. Kacie returned to Spearfish after she completed treatment. Alcohol was not an issue for Kacie at the time of trial.

[¶7.] Dr. Bill Moss, a licensed psychologist, was appointed by the court to conduct a custody evaluation. Dr. Moss reported that Patrick was stable and dedicated to the children. However, Dr. Moss found that Patrick did not have a strong emotional connection with the children. Dr. Moss found that Kacie struggled with insecurity and had traits of emotional dependency. At the time of trial, she

was making strides toward financial stability although her income was unpredictable. She had also successfully maintained sobriety. In making a child custody recommendation, Dr. Moss considered Patrick's and Kacie's parental fitness, stability, harmful parental misconduct, primary caretaker status, and the children's preferences. Dr. Moss ultimately recommended that Kacie have primary physical custody of the parties' minor children because "she ha[d] the better emotional bond with the children and ha[d] established this relationship through constant effort."

[¶8.] Cheryl Wales, a licensed counselor, had counseled M.N. and J.N. and also worked with Kacie and Patrick through couples counseling. Wales testified that M.N. had experienced problems while in Patrick's care, but Patrick appropriately handled the problems. She also mentioned that M.N.'s grades had dropped while in Patrick's care. According to Wales, all four children were aware of the April 27, 2013 incident involving Kacie. Wales disagreed with Dr. Moss's conclusion. Wales believed Dr. Moss's recommendation was based solely on Kacie's emotional availability. While not discounting Kacie's emotional availability for the children, Wales found that Patrick's structure, routine, and stability made him the better parent to serve the children's best interests. Wales also testified that M.N. wanted to live with his father and that he would run away if he was required to live with Kacie.

[¶9.] At the end of the trial, the court interviewed M.N. in camera. After returning home from a weekend visitation, M.N. told Patrick that Kacie had questioned him about his in camera visit with the court. Because of this incident,

M.N. refused to attend another visitation with Kacie, and Patrick moved to suspend visitation between M.N. and Kacie. Wales advised Patrick to not comply with the court-ordered visitation, and Patrick acted on that advice. Dr. Moss disagreed with this course of action and thought Patrick should have done more to reunite M.N. with his mother. Patrick's motion to suspend visitation was denied.

[¶10.] Patrick and Kacie's 2012 joint income tax return reported income of $722,197. It appears this amount was "paper income" (retained earnings) from different entities—primarily Fast Fusion. Patrick did not receive the money. The 2012 tax return also reported $10,394 in wages, $3,409 in taxable interest, and $76,651 in ordinary dividends. The 2012 tax return showed a loss of $1,193,992 as a result of past investment failures.

[¶11.] Patrick submitted a list of deposits reflecting 2013 income of $159,161. The funds were Fast Fusion distributions for the payment of Patrick's individual tax liability. The court found that these funds were available for personal use. Patrick was also receiving $4,000 per month for the repayment of a loan he made to Podo Technologies. At the time of trial, the loan payments were expected for the next forty-eight months. No further income was anticipated from Podo Technology. Patrick was also receiving $682 per month in Social Security benefits for M.N.

[¶12.] Both Patrick and Kacie have college degrees. After reentering the labor market, Kacie became employed as a receptionist working thirty hours a week earning $12 per hour. Kacie also worked as a freelance photographer and was working toward a master's degree in fine arts, which was expected to be completed in one year. The court calculated Kacie's monthly income for child support purposes

at $1,548. The court did not calculate Patrick's monthly income for child support. The court noted that his current income was "not easily determined."

[¶13.] The court accepted the custody findings and recommendations of Dr. Moss. The court ordered joint legal custody with primary physical custody awarded to Kacie subject to liberal parenting time for Patrick. The court awarded $3,800 in monthly child support. The court also awarded Kacie rehabilitative alimony of $1,000 per month for a period of twelve months, and the court ordered Patrick to pay $7,500 in attorney's fees and costs. In dividing the parties' property, the court awarded Kacie $43,000 from Patrick's Wells Fargo ROIC LCC savings account and $304 from Patrick's Wells Fargo ROIC LCC checking account. Patrick appeals each of these decisions.

*Decision*

*Child Custody*

[¶14.] Patrick argues that the court clearly erred in its child custody findings relating to harmful parental misconduct by Kacie, her parental fitness and stability, and M.N.'s stated preference. Patrick further argues that the court erred in failing to make an express determination whether Kacie rebutted a purported presumption against her having custody because she had been "convict[ed] of domestic abuse."

[¶15.] "The best interest of the child standard is [applied] when parents seek an initial judicial determination of the custody of their children." *Kreps v. Kreps*, 2010 S.D. 12, ¶ 26, 778 N.W.2d 835, 843. "The best interests of the child are determined by considering the child's temporal, mental, and moral welfare." *Pietrzak v. Schroeder*, 2009 S.D. 1, ¶ 39, 759 N.W.2d 734, 744. There are several

#27179

factors that the court should consider: parental fitness, stability, primary caretaker, child's preference, harmful parental misconduct, and separating siblings. *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, ¶¶ 24-34, 591 N.W.2d 798, 807-10. In evaluating parental fitness, the circuit court should consider:

> (1) mental and physical health; (2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs; (3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed; (4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent; (5) commitment to prepare the child for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

*Id.* ¶ 24, 591 N.W.2d at 807 (citations omitted). In evaluating parental stability, the circuit court should consider:

> (1) the relationship and interaction of the child with the parents, step-parents, siblings and extended families; (2) the child's adjustment to home, school and community; (3) the parent with whom the child has formed a closer attachment, as attachment between parent and child is an important developmental phenomena and breaking a healthy attachment can cause detriment; and (4) continuity, because when a child has been in one custodial setting for a long time pursuant to court order or by agreement, a court ought to be reluctant to make a change if only a theoretical or slight advantage for the child might be gained.

*Id.* ¶ 26, 591 N.W.2d at 808 (citations omitted). With respect to harmful parental misconduct, "[t]he harmful effect is self-evident when parental misconduct is committed in the presence of a child old enough to perceive the misconduct." *Price v. Price*, 2000 S.D. 64, ¶ 42, 611 N.W.2d 425, 435 (quoting *Fuerstenberg*, 1999 S.D. 35, ¶ 31, 591 N.W.2d at 809).

-6-

[¶16.]     "'We encourage trial courts to take a balanced and systematic approach when applying the factors relevant to a child custody proceeding.'" *Roth v. Haag*, 2013 S.D. 48, ¶ 13, 834 N.W.2d 337, 340 (quoting *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 18, 826 N.W.2d 627, 634). "However, 'a court is not bound to make a specific finding in each category; indeed, certain elements may have no application in some cases, and for other cases there may be additional relevant considerations. In the end, our brightest beacon remains the best interests of the [children].'" *Id.* (quoting *Beaulieu v. Birdsbill*, 2012 S.D. 45, ¶ 10, 815 N.W.2d 569, 572). This Court will only disturb the circuit court's determination on child custody if there was an abuse of discretion. *Pietrzak*, 2009 S.D. 1, ¶ 37, 759 N.W.2d at 743. "'An abuse of discretion can simply be an error of law or . . . discretion exercised to an unjustified purpose, against reason and evidence.'" *Goeden v. Daum*, 2003 S.D. 91, ¶ 7, 668 N.W.2d 108, 111 (quoting *Sjomeling v. Stuber*, 2000 S.D. 103, ¶ 11, 615 N.W.2d 613, 616.)

[¶17.]     Instead of making its own written findings on the *Fuerstenberg* factors, the court adopted Dr. Moss's findings and recommendations. In his analysis, Dr. Moss addressed each *Fuerstenberg* factor in detail. Dr. Moss addressed all six areas considered when analyzing parental fitness. Dr. Moss found that Patrick had the advantage in mental and physical health due to Kacie working to maintain her sobriety. Dr. Moss found that Patrick would be better to provide basic needs as he had a steadier source of income. Kacie, however, was found better able to address the children's emotional needs. Dr. Moss did not believe co-parenting was an option, and he found that both parents were equal when it came to their

commitment to teach the children what it meant to be a responsible adult and a model parent, spouse, and citizen.

[¶18.]     In considering stability, Dr. Moss found that Kacie had provided a steadier presence in the children's lives. While both parents were dedicated to their children's welfare, Dr. Moss found that Kacie had been more involved in the children's activities and had been the primary caretaker. Dr. Moss also found that the children had a better emotional bond with Kacie. Contrary to Patrick's assertion, Dr. Moss did consider Kacie's actions in front of the children the night of her arrest. Finally, Dr. Moss felt that it would be best not to separate the four siblings as they all shared a strong emotional bond with each other. Although there was no mention of M.N.'s preference in either the court's or Dr. Moss's findings, the court was aware of his wishes. The circuit court does not need to make findings on each factor. *See Roth*, 2013 S.D. 48, ¶ 13, 834 N.W.2d at 340. Considering the totality of this factual analysis adopted by the court, we find no abuse of discretion in awarding Kacie physical custody.

[¶19.]     We also find no error in the court's failure to make an explicit finding that Kacie "rebutted the presumption" against her having custody because of her "conviction of domestic abuse." A "conviction or history of domestic abuse creates a rebuttable presumption that awarding custody to the abusive parent is not in the best interest of the minor." SDCL 25-4-45.5. The presumption arises under one of three situations:

> (1) A conviction of domestic abuse as defined in subdivision 25-10-1(1); or

(2) A conviction of assault against a person as defined in
subdivision 25-10-1(2), except against any person related by
consanguinity, but not living in the same household; or

(3) A history of domestic abuse.

. . . . A history of domestic abuse may only be proven by greater
convincing force of the evidence.

*Id.*

[¶20.]     Kacie was convicted of disorderly conduct.  Although Patrick characterizes Kacie's underlying actions as "domestic violence," Kacie was not "convicted" of domestic abuse within the meaning of SDCL 25-4-45.5(1) or assault within the meaning of SDCL 25-4-45.5(2).  Therefore, for the presumption to have arisen, Patrick must have proven a "history of domestic abuse" within the meaning of SDCL 25-4-45.5(3).  Patrick did not meet his initial burden of establishing such a history.  Although Patrick relies on the April 27, 2013 incident and other claimed instances of abuse, Dr. Moss reviewed Patrick's claims and determined that they did not rise to the level of documented domestic abuse.  Because Patrick did not establish a history of domestic abuse, the presumption did not arise.  And because the presumption did not arise, the circuit court was not required to enter a finding whether Kacie rebutted the presumption.

*Child Support*

[¶21.]     Patrick argues that the circuit court's findings do not support a $3,800 child support obligation.  Patrick also argues that his income was "pass-through" corporate income that should not have been considered to calculate child support.

[¶22.]     "The court is required to set a child support obligation based on an income schedule established by the Legislature."  *Hill v. Hill*, 2009 S.D. 18, ¶ 6, 763 N.W.2d 818, 822.  In this case, Kacie requested $3,804 in child support—the highest

scheduled support for four children. Patrick did not submit any child support calculations. The circuit court awarded $3,800. To warrant that level of support, the court must have found that the parents' joint monthly income was approximately $20,000. *See* SDCL 25-7-6.2 (indicating that joint monthly income must be $19,950 for a support order of $3,795 and $20,000 for a support order of $3,804).

[¶23.]	The court found that Kacie's monthly income was $1,548. The court did not, however, make an income finding for Patrick. Instead, the court noted:

> Patrick currently receives $4,000 per month from Podo Technologies as repayment on a loan of $1,000,000, payable over the next 48 months. The parties' 2012 joint income tax return shows income of [$722,197]. According to Exhibit 17, Patrick deposited to his account in 2013, a total of [$159,161], which was available for personal use. Patrick testified that he had zero earnings in 2013. Patrick's present earnings are not easily determined as he has been less than helpful in providing current financial information.

The failure to enter findings on Patrick's income is problematic because Patrick argues that, with the exception of the loan repayment, the remaining amounts are pass-through income that should not be considered in calculating child support. Kacie does not respond to this argument. She merely provides a calculation that uses the alleged pass-through income of $722,197.

[¶24.]	Under our statutory scheme, "pass-through corporate income . . . included on [a parent's] federal income tax return should not [be] included in calculating . . . gross income for child support purposes when [the parent] did not actually receive the corporate income and had no control over its distribution." *Roberts v. Roberts*, 2003 S.D. 75, ¶ 24, 666 N.W.2d 477, 484. However, money

actually received by a parent from a corporation to meet the parent's tax liability on pass-through income should be included in the calculation of that parent's gross income for child support purposes. *Id*. ¶ 26.

[¶25.]     According to Patrick, the $722,197 shown on his 2012 tax return was pass-through income from Fast Fusion and his trust—money over which he had no control and was not available to him. The court made no finding on this issue. With respect to the $159,161 of 2013 income, the court found that the sum was available for personal use. This sum appears to be money received for Patrick to meet his tax liability on pass-through income. Therefore it may have been considered for child support purposes. *See id*. However, the circuit court did not make any finding of Patrick's net monthly income for purposes of calculating support under SDCL 25-7-6.2. Therefore, we cannot determine if the circuit court's award was based on 2013 income that was available for child support calculations ($159,161) or based on older 2012 income that may not be representative of the parties' current situation.

[¶26.]     Furthermore, even if we assume the circuit court used $159,161 in calculating Patrick's monthly income, that amount does not meet the monthly threshold required. Using that figure, Patrick's average monthly income was $13,262.58 in 2013 ($159,161/12 months = $13,262.58). Assuming that Patrick's $4,000 per month loan repayment is additional countable income, his monthly income equaled $17,262.58 ($13,260.58 + $4000). Adding Kacie's monthly income ($1,548), the parties' joint gross income was $18,810.58, which is less than the income required for a $3,800 support obligation under SDCL 25-7-6.2. Further, the

-11-

circuit court did not enter any findings indicating that there was a need to set child support above the scheduled maximum.

[¶27.] Because of the lack of findings, we are unable to determine whether the circuit court considered appropriate income and whether the appropriate income supports the support obligation ordered. Thus, we cannot review the circuit court's child support decision. *See Hill,* 2009 S.D. 18, ¶ 8, 763 N.W.2d at 822 ("We have consistently required adequate findings of fact regarding the child's needs and standard of living when a court sets support above the schedule's maximum."). "It is well-settled law that it is the trial court's duty to make required findings of fact, and the failure to do so constitutes reversible error. The absence of findings . . . makes meaningful review impossible." *Grode v. Grode*, 1996 S.D. 15, ¶ 29, 543 N.W.2d 795, 803 (citations omitted). We reverse and remand for the circuit court to make findings on Patrick's actual or imputed monthly income for child support purposes. Because of the difficulties in ascertaining Patrick's income at the time of trial, the circuit court may consider additional evidence on remand. Additionally, as we advised in *Roberts*, "[o]n remand, . . . the circuit court should decide whether the tax distribution would be an allowable deduction under SDCL 25-7-6.7 or would provide the basis for a deviation under SDCL 25-7-6.10." 2003 S.D. 75, ¶ 26, 666 N.W.2d at 484.

*Alimony*

[¶28.] Patrick argues that the circuit court's findings were insufficient to award $1,000 in rehabilitative alimony for twelve months. Generally, "[i]n deciding whether alimony is warranted, the court should consider: (1) the length of the

marriage; (2) each party's earning capacity; (3) their financial conditions after the property division; (4) each party's age, health, and physical condition; (5) their station in life or social standing; and (6) the relative fault in the termination of the marriage." *Lovejoy v. Lovejoy*, 2010 S.D. 39, ¶ 7, 782 N.W.2d 669, 672. "Rehabilitative alimony is awarded to enable a former spouse to refresh or enhance the job skills . . . she needs to earn a living." *Wilson v. Wilson*, 434 N.W.2d 742, 744 (S.D. 1989) (emphasis omitted). "The purpose of rehabilitative alimony is to put a spouse in a position to upgrade his or her economic marketability." *Id.* "Additional factors must be taken into consideration in awarding rehabilitative alimony[.]" *Id.* at 745. A circuit "court must consider (1) the supporting spouse's contributions, (2) the forgone opportunities to enhance or improve marketable skills, and (3) the duration of the marriage following completion of the non-supporting spouse's education." *Zepeda v. Zepeda*, 2001 S.D. 101, ¶ 25, 632 N.W.2d 48, 56. "An essential prerequisite to recovering rehabilitative alimony is [also] proof of an educational need and a plan to meet that need." *Id.*

[¶29.]     In this case, there are insufficient findings to support Kacie's award of rehabilitative alimony. The court only made one conclusory finding: "Kacie has a need for rehabilitative alimony for the ensuing 12 months until she can get stabilized financially. Patrick has the ability to pay spousal support." The court made no findings on Patrick's earning capacity and Kacie's educational need and plan to meet that need.*  Further, there are no findings identifying the parties'

---

\*     The circuit court only noted that "Kacie has a Bachelor of Science degree in Art and History and is currently working online towards a master's degree in

(continued . . .)

financial condition after the property division; their station in life or social standing; their relative fault in the termination of the marriage; the supporting spouse's contributions; and if applicable, the forgone opportunities to enhance or improve marketable skills and the duration of the marriage following completion of the non-supporting spouse's education. Consequently, the court's findings are insufficient to permit appellate review. *See id.* "We afford considerable weight to a circuit court's exercise of discretion, but we can only evaluate that discretion by reviewing the court's detailed findings." *Lovejoy*, 2010 S.D. 39, ¶ 11, 782 N.W.2d at 673. We reverse and remand for the entry of detailed findings supporting an award of rehabilitative alimony.

*Property Division*

[¶30.]    Patrick argues that the circuit court abused its discretion in awarding Kacie $43,000 (half of the balance in the ROIC savings account) and $304 (half of the balance in the ROIC checking account). Patrick contends that this inherited money was non-marital property that should not have been divided. The circuit court's property division is reviewed under the abuse of discretion standard. *Schieffer*, 2013 S.D. 11, ¶ 13, 826 N.W.2d at 633.

[¶31.]    "When a divorce is granted, the courts may make an equitable division of the property belonging to either or both, whether the title to such property is in the name of the husband or the wife. In making such division of the property, the court shall have regard for equity and the circumstances of the parties." SDCL 25-

---

(. . . continued)
    fine arts from the University of San Francisco, a degree she expects to earn
    next year."

4-44. The factors to consider are "(1) the duration of the marriage; (2) the value of the property owned by the parties; (3) the ages of the parties; (4) the health of the parties; (5) the competency of the parties to earn a living; (6) the contribution of each party to the accumulation of the property; and (7) the income-producing capacity of the parties' assets." *Novak v. Novak*, 2006 S.D. 34, ¶ 4, 713 N.W.2d 551, 552.

[¶32.]     "South Dakota is an 'all property state,' meaning all property of the 'divorcing parties is subject to equitable division by the circuit court, regardless of title or origin.'" *Halbersma v. Halbersma*, 2009 S.D. 98, ¶ 9, 775 N.W.2d 210, 214 (quoting *Endres v. Endres*, 532 N.W.2d 65, 68 (S.D. 1995)). "In arriving at an equitable division of property, a circuit court must classify property as 'marital' or 'non-marital.' A circuit court has broad discretion in determining whether property is marital or non-marital." *Id.* ¶ 10, 775 N.W.2d at 215 (citation omitted). "Only where one spouse has made no or *de minimis* contributions to the acquisition or maintenance of an item of property and has no need for support, should a court set it aside as 'non-marital' property." *Novak*, 2006 S.D. 34, ¶ 5, 713 N.W.2d at 552-53. "Consequently, inherited property 'is not ipso facto excluded from consideration in the overall division of property.'" *Id.* ¶ 5, 713 N.W.2d at 553 (quoting *Billion v. Billion*, 1996 S.D. 101, ¶ 20, 553 N.W.2d 226, 232).

[¶33.]     In this case the circuit court's only findings supporting its property division are that: "The parties have no interest in land. The Court accepts the property division proposed on [Kacie's] Exhibit . . . as an equitable division of the property and debts." The court made no findings on the factors necessary to review

-15-

the property division. "It is well-settled law that it is the trial court's duty to make required findings of fact [for the division of property in a divorce action], and the failure to do so constitutes reversible error. The absence of findings on these issues makes meaningful review impossible." *Grode*, 1996 S.D. 15, ¶ 29, 543 N.W.2d at 803 (citations omitted). We reverse and remand for entry of the relevant findings necessary to support the court's property division.

*Attorney's Fees*

[¶34.] Patrick argues that the circuit court did not perform the required analysis in awarding attorney's fees. "Generally, trial courts may award attorney fees in cases involving divorce, support, or alimony." *Huffaker v. Huffaker*, 2012 S.D. 81, ¶ 32, 823 N.W.2d 787, 794 (citing SDCL 15-17-38). A two-step analysis is typically used.

> First, the court must determine what constitutes a reasonable attorney's fee. This requires consideration of (1) the amount and value of the property involved, (2) the intricacy and importance of the litigation, (3) the labor and time involved, (4) the skill required to draw the pleadings and try the case, (5) the discovery utilized, (6) whether there were complicated legal problems, (7) the time required for the trial, and (8) whether briefs were required. Second, it must determine the necessity for such fee. That is, what portion of that fee, if any, should be allowed as costs to be paid by the opposing party. This requires consideration of the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case.

*Id*. (quoting *Urbaniak v. Urbaniak*, 2011 S.D. 83, ¶ 31, 807 N.W.2d 621, 628). The circuit court's allowance or disallowance of attorney's fees is reviewed for abuse of discretion. *Terca v. Terca*, 2008 S.D. 99, ¶ 18, 757 N.W.2d 319, 324.

[¶35.]     In this case, Kacie requested attorney's fees in the amount of $31,828.73. The circuit court stated that it considered the first eight factors for attorney's fees plus "whether either party unreasonably prolonged the divorce." The court then ordered that Patrick pay Kacie $7,500 in attorney's fees. Although the court stated that it "considered" the relevant factors, it made no specific findings on those factors. "This Court has consistently required trial courts to enter findings of fact and conclusions of law when ruling on a request for attorney fees. Without findings of facts and conclusions of law there is nothing to review." *Crisman v. Determan Chiropractic, Inc.*, 2004 S.D. 103, ¶ 30, 687 N.W.2d 507, 514 (citation omitted). "The trial court is required to make specific findings based upon the factors." *Smetana v. Smetana*, 2007 S.D. 5, ¶ 20, 726 N.W.2d 887, 895 (quoting *Crisman*, 2004 S.D. 103, ¶ 30, 687 N.W.2d at 514) (internal quotation marks omitted). "In light of this Court's decision to reverse and remand on other issues, on remand the trial court should reconsider the award of attorney fees under the two-step analysis set forth by this Court." *See Huffaker*, 2012 S.D. 81, ¶ 33, 823 N.W.2d at 795.

[¶36.]     We affirm the circuit court's decision on child custody. We reverse and remand for the entry of findings of fact on all remaining issues. The judge who presided at trial has retired. If he is unavailable to preside over the remand proceedings, the next judge may hear new evidence on all remanded issues. Kacie's motion for appellate attorney's fees is denied.

[¶37.]     GILBERTSON, Chief Justice, SEVERSON, WILBUR, and KERN, Justices, concur.