#27661, #27670-r-SLZ

**2016 S.D. 71**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

KELLY JO STREIER f/k/a
KELLY JO PIKE,                                    Plaintiff and Appellee,

v.

JEFFREY A. PIKE,                                  Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CARMEN MEANS
Judge

* * * *

MELISSA E. NEVILLE of
Bantz, Gosch & Cremer, LLC
Aberdeen, South Dakota          Attorneys for plaintiff
                                and appellee.


REED T. MAHLKE
DONALD M. MCCARTY of
Helsper, McCarty,
 & Rasmussen, PC
Brookings, South Dakota         Attorneys for defendant
                                and appellant.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 29, 2016

OPINION FILED **10/05/16**

#27661, #27670

ZINTER, Justice

[¶1.]        This appeal concerns the circuit court's division of the parties' only income-producing asset, a restaurant; the court's finding of husband in contempt; and the court's decision denying wife's request for an award of attorney's fees. Because the circuit court impermissibly modified the original judgment and decree by converting a property-equalization payment to an alimony payment, we reverse and remand. We also reverse the order of contempt and decline to decide the question of attorney's fees.

*Facts and Procedural History*

[¶2.]        The procedural history of this case is lengthy, but necessary to understand the circuit court's resolution of a protracted post-decree dispute over the parties' property division. Kelly Jo Pike sued Jeffrey Pike for divorce in May 2013. The parties mediated and resolved custody and visitation issues but could not agree on a division of the marital property. At a April 2014 trial, the parties litigated four issues: (a) the value of the parties' restaurant business (Lunkers), (b) whether Jeffrey's contribution to the purchase of the business should be excluded from the property division as premarital property, (c) an equitable division of the business's net value, and (d) an equitable division of $10,682 the parties owed on credit cards held in Kelly's name.

[¶3.]        On June 12, 2014, the court issued amended findings of fact and conclusions of law and an amended judgment and decree of divorce. Based on the conflicting evidence, the circuit court valued the business at $800,384. It then subtracted $549,000 of debt, for a net value of $251,384. The court provided two

options for the division of the net value. It first ruled that Kelly was "entitled to a cash payment of $105,503.28," which included one half ($5,341) of the parties' credit card debt. The court entered a judgment in favor of Kelly in this amount with interest, giving Jeffrey a grace period of 90 days from the entry of the judgment to pay Kelly in full. The court further ordered that Jeffrey "shall keep the business" contingent on, among other things, Jeffrey paying Kelly in full within 90 days of the entry of the judgment and decree. In its second option, the court ruled that "in lieu of the cash payment," Jeffrey could immediately put the property up for sale with the net proceeds to be split equally between Kelly and Jeffrey. The second option, via Paragraph 7, provided:

> In the event that [Jeffrey] finds he is unable to pay [Kelly] within the 90-day period, he shall immediately place the Lunkers business and property up for sale with the net proceeds to be split between the parties in lieu of the cash payment. The proceeds from the business sale shall be substituted into Trial Exhibit 1 for the actual value of the business and the assets and debts shall be divided equally, taking into consideration the other awards of property and debts.

The court specifically ordered that "[n]either party shall pay the other alimony." Notice of entry of the amended judgment and decree was given, and neither party appealed.

[¶4.]     Six months later, Jeffrey returned to court and began claiming the business had no value and he could not comply with either option. On December 18, 2014, he moved for emergency relief, to allow an auction and to find Kelly in contempt. Jeffrey requested emergency relief because the furnace had failed and he did not "have the money [for repairs]." He also alleged that the "business [was] failing at this point[, he could] hardly keep the doors open, and business for the

-2-

spring [was] not looking good." He informed the court that he had listed the business for sale on September 18, 2014, and had received no interest. He asked the court to "award [him] Lunkers at a zero value, or in the alternative to allow the sale of Lunkers at auction and the [c]ourt set a reserve in terms of the sale." He requested that, "[i]n the event the restaurant goes 'no sale,'" the court should award him the business "at a zero value (or that [he] be allowed to let the property go into foreclosure, at [his] discretion)[.]" In Jeffrey's view, this result would allow the parties to "move forward and finalize the property division based on a zero value for the business assets and debts (or in the event of a foreclosure that any shortfall be divided equally between the parties), with the exception of whatever the [c]ourt [would] determine[] regarding the furnace herein."

[¶5.]        The court held a hearing on this request on February 12 and 27, 2015. The court heard testimony from a realtor describing the reason the business was a difficult property to sell and the factors one would consider when listing a property and setting a price. The court also heard testimony from the realtor that listed the business. He informed the court that it was listed at $995,000, he had received no offers, and he had no showings during the five-month listing period. The realtor opined that reducing the sale price to mid $700,000 would increase interest in the property. Kelly offered testimony from an accountant on the profitability and expenses of the business since the divorce to refute Jeffrey's claim that the business was failing.

[¶6.]        Jeffrey again asked the court to give him the business at "zero [value] on [his] side of the equation[.]" He said he could not pay the equalizing payment

previously ordered by the court. He asked the court to, in the alternative, allow him to sell the business by auction "to get this over with and done with and sell it." He testified that in order to pay Kelly her cash-equalization payment, the business would have to sell for $870,000. He informed the court that he was "doing everything" he could to keep the business going.

[¶7.]    At the conclusion of the hearing, the court orally ruled that "on the first go around [the court] was trying to look for a way for you [Kelly] to get some money out of the business and for you [Jeffrey] to keep the business going and it's created some problems[.]" The court informed the parties that it was "going to give [Jeffrey] some options and [the court] want[ed] a decision by March 15."

> The first option is probably one that can't be taken because we've tried in the past and that is paying what's owed. . . . The second option and this is probably the best option and gives you what you're looking for as far as the award and it gives you an option or an opportunity to keep your dream alive, and that is to convert the award, the money award to an alimony award which is nondischargable in bankruptcy . . . . And that takes the sale of the property off the market, it's just done, you just owe the alimony[.] . . . The last option is this, and so this is a risky one, but it's to keep the business on the market until May [f]irst and if it's not sold on or before May [f]irst [the court is] going to order that the business be auctioned within 30 days and that be a reserve only up to the amount that's owed the bank.

The court indicated that, if Jeffrey chose the auction option, the court would "reserve the right to adjust the property settlement for Kelly based upon some of the expenses that may be involved[.]" Counsel for Jeffrey asked the court whether the reservation to change the property division applied to all parties. The court explained that it meant it would "take into account expenses of sale and so forth" and that the parties could submit what they believed would "be an appropriate

adjustment and [the court would] give everybody an opportunity to weigh in on those."

[¶8.] On April 20, 2015, the court formalized this decision in an order giving Jeffrey "an election with three options by March 17, 2015[.]" Those options were: (1) pay Kelly the judgment amount of $105,503, (2) convert the judgment amount to a lump-sum alimony award payable over the course of eight to ten years, or (3) keep the business listed and sell it (the listing agreement was to continue until May 1, 2015). If the business had not sold by that time, the property was to be auctioned within 30 days. The court set the reserve price for the auction at $515,000, which was the amount of debt against the property. The court reserved "the right to adjust the total overall property division as Ordered previously." The court indicated that it would "make further determination as to how to proceed" if the business went "no sale" at auction. The court ordered Jeffrey to use his best efforts to keep the business open and operating at its current service levels. Neither party appealed this order.

[¶9.] On May 20, 2015, Jeffrey moved to modify the reserve or, in the alternative, "simply award the business to [him] and not require any further cash equalization payment from Kelly or [him] to the other." On June 5, 2015, Kelly moved for an order to show cause and for relief from the judgment. She alleged that Jeffrey had failed to abide by the June 2014 and April 2015 orders. She claimed Jeffrey failed to "cooperate in the listing, selling or auctioning of the property[.]" Kelly asked the court to relieve her from the judgment because Jeffrey had "deliberately delayed this matter, unnecessarily increased her attorney's fees, and

repeatedly refused to follow the [c]ourt's orders, all while failing to maintain the property." Kelly also requested an award of attorney's fees.

[¶10.]    On July 23, 2015, the court, before a different judge,[1] held a hearing on both motions. Jeffrey presented testimony from a realtor supporting his request to modify the reserve. Jeffrey also reported on the status of the business, and he expressed his opinion on whether it should be sold or auctioned. He then claimed that, depending on the amount received at auction, Kelly could end up owing him money as a cash-equalizing payment. Kelly testified that she never liked the auction idea, and she agreed with Jeffrey that an auction would likely be disastrous for both parties' financial conditions. She opined that, if the court were to order an auction, the amount of the reserve should be set at the value the court placed on the business at the conclusion of the divorce trial. She testified that, in her view, the court should convert the cash-equalization payment to a lump-sum alimony award.

[¶11.]    In its oral ruling at the conclusion of the hearing, the court resolved the property division dispute by confirming that the business had value, awarding Jeffrey the business, and converting the cash-equalization payment to a lump-sum alimony award to be paid in installments. The court explained,

> I feel as if I can see what Judge Timm was trying to accomplish both with the order the way he worded it and the reserve that he set back in April of 2015. My feeling is that he wanted to see this done as well and so he set the reserve as low as humanly possible so that if it came down push to shove to an auction that the darn thing would sell because it seems as if nobody is cooperating to get this thing moving forward.
>
> . . . .

---

1.    Judge Robert Timm had retired.

> You [Jeffrey] have a business that has a value. You want that business. You get that business. I'm going to order as of today that the business is yours free and clear and I am converting the $105,000 thereabouts . . . to an alimony payment that will be paid over the next 10 years, it will be paid quarterly.
>
> . . . .
>
> It gives both parties the knowledge that they don't need to come back into court asking about terms of sale, reserve and things of those nature because it's done. This business is yours [Jeffrey] to run as you wish. . . . In exchange for that you owe [Kelly] the cash equalization payment that the [c]ourt previously awarded.

On the issue of attorney's fees, the court ruled that it would not order Jeffrey to pay Kelly's attorney's fees. However, the court did find Jeffrey in contempt of the April 2015 order.

[¶12.] Each party submitted proposed findings of fact and conclusions of law, as well as objections to the other's proposals. Jeffrey did not object to the court's decision to award him the business. Jeffrey, however, proposed that the court reduce the value of the business from approximately $800,000 to $700,000, which he believed would in turn reduce the amount of the equalizing payment owed to Kelly. Jeffrey did not object to the court's decision to transfer the equalizing payment to a lump-sum alimony award. He, however, asked that the court not award interest on his obligation to pay Kelly the alimony award.

[¶13.] On August 17, 2015, the circuit court issued findings of fact and conclusions of law and an order consistent with its oral ruling. The court awarded the business to Jeffrey "free and clear of any claim" by Kelly. The court voided the sale provision in Paragraph 7 of the June 2014 amended judgment and decree because the business did not sell and Jeffrey was in contempt. The court converted the $100,162 cash-equalizing payment (the original amount less the credit card

debt) to a lump-sum alimony award to be paid quarterly with 10% interest on unpaid installments. Finally, the court denied Kelly's request for attorney's fees. The court explained that it declined to award attorney's fees so that "[Jeffrey] may be better able to pay his quarterly installments to [Kelly] and to allow him an opportunity to get the business thriving again."

[¶14.]     Jeffrey appeals, raising three issues:

1.     Whether the circuit court's voiding of the sale option was an impermissible modification of the property division in the judgment and decree of divorce.

2.     Whether the circuit court erred in converting the cash-equalization obligation in the property division to alimony.

3.     Whether the circuit court erred in finding Jeffrey in contempt.

By notice of review, Kelly appeals the circuit court's denial of her request for attorney's fees.

*Decision*

*Voiding of the Sale Option*

[¶15.]     Jeffrey argues that the circuit court's August 2015 order voiding the sale option impermissibly modified the June 2014 and April 2015 property division. He claims that the original property division gave him a right to sell the property with the net proceeds of the sale substituted for the court's initial valuation of the business at $800,384. Under the original property division, this substituted value would have been used to divide the net value of the business between the parties instead of Kelly receiving the fixed $100,162 of the $251,384 value the court had originally set. In Jeffrey's view, voiding the original sale option disadvantaged him because a sale of the business at no or negative net value would have reduced

-8-

Kelly's share of the value of the business to the point that there would have been no equalization payment payable to Kelly.

[¶16.]    It is well settled that a property settlement is not subject to modification "[a]bsent fraud or some other reason which would apply to any judgment[.]" *Duran v. Duran*, 2003 S.D. 15, ¶ 15 n.2, 657 N.W.2d 692, 698 n.2 (quoting *Beermann v. Beermann*, 526 N.W.2d 127, 129 (S.D. 1995)); *Sjomeling v. Sjomeling*, 472 N.W.2d 487, 489 (S.D. 1991). However, a "court may enter an order enforcing or clarifying the divorce decree." *Hiller v. Hiller*, 2015 S.D. 58, ¶ 12, 866 N.W.2d 536, 541 (citing *Sjomeling*, 472 N.W.2d at 490; *Hisgen v. Hisgen*, 1996 S.D. 122, ¶ 9, 554 N.W.2d 494, 497). Further, "[w]hile a property division is irrevocably fixed by the terms of the divorce decree and cannot be later modified, if indeterminate language was employed, a court may clarify its decree[.]" *Hisgen*, 1996 S.D. 122, ¶ 9, 554 N.W.2d at 497.

[¶17.]    Here, the court's first order (June 2014) employed indeterminate, open-ended language to divide the parties' restaurant. This decree provided two options rather than vesting any right to the business or its value in either party. *Cf. Johnson v. Lowary*, 81 S.D. 202, 205, 132 N.W.2d 823, 825 (1965) (awarding title in real property that vested in plaintiff and could not be modified to later vest in defendant). Under the first option, the court valued the business and awarded Kelly an equitable share of that value. It ordered that Jeffrey was to get the business, but on the condition that Jeffrey pay Kelly her share within 90 days of the entry of the judgment and decree. The decree also provided a second option, an option for a sale (or later an auction, another option that Jeffrey requested). Jeffrey

recognized that the court's first order did not constitute a final division that vested property rights. Six months after the initial decree he specifically requested the court to move forward and "finalize the property division."

[¶18.] Ultimately, the open-ended language of the initial decree allowing Jeffrey the option to pay Kelly her share or sell/auction the business became problematic, and the court attempted three additional clarifying options (April 2015 order). However, Jeffrey either failed to or was unable to comply with any option despite more than one year of post-decree litigation seeking clarification and enforcement. Under these circumstances, the court had no choice but to enter a clarifying order (August 2015 order) choosing one of the two options that it had initially ordered.[2] The court did not err in finalizing its original indeterminate, open-ended property division. *See Hisgen*, 1996 S.D. 122, ¶ 9, 554 N.W.2d at 497.

*Conversion of the Property Division Payment to Alimony*

[¶19.] Jeffrey argues that the circuit court's August 2015 order impermissibly modified the June 2014 judgment and decree because it ordered him to pay Kelly alimony instead of a property-equalization payment. He points out that the court's June 2014 judgment specifically decreed that neither party was to pay alimony to the other.[3]

---

2. It is noteworthy that Jeffrey did not object to the court's provision voiding the sale option. On the contrary, Jeffrey proposed a conclusion of law that "[t]he business is not ordered to be sold."

3. Jeffrey did not object to the court's August 2015 conversion to alimony. In fact, he proposed that he be "awarded the business at that value [$700,000] and the equalizing payment shall be transferred to a lump sum alimony award and adjusted accordingly." And Kelly did not object to the court's

(continued . . .)

[¶20.]        Notwithstanding this alimony decree, the August 2015 order converted the June 2014 property-equalization payment to an alimony award. This the court could not do. *See Saxvik v. Saxvik*, 1996 S.D. 18, ¶ 15, 544 N.W.2d 177, 180; *Midzak v. Midzak*, 2005 S.D. 58, ¶ 28, 697 N.W.2d 733, 740 (reiterating that when the court originally finds no basis for an award of alimony, does not reserve the option to award alimony in the future, and enters a final judgment without such an award, the court cannot thereafter award alimony as a modification of the original decree).

[¶21.]        Kelly, however, argues that the court did not improperly modify the original judgment and decree because this Court has said that a lump-sum alimony award is in the nature of a property award. *See Sanford v. Sanford*, 2005 S.D. 34, ¶ 24, 694 N.W.2d 283, 290 (a lump-sum alimony award "is in many respects similar to a property division"). However, the *Sanford* Court also reiterated additional differences, and we did not hold that the awards are interchangeable. In fact, one difference is significant in a case like this where Jeffrey claims the business has zero or negative value. A property obligation is dischargeable in bankruptcy, but an alimony obligation is not. *Hogie v. Hogie*, 527 N.W.2d 915, 918 (S.D. 1995).

[¶22.]        With the exception of clarifications previously discussed, "[i]t is the settled law of this state that the division of property pursuant to a divorce decree is

_____

(. . . continued)
        decision awarding Jeffrey the business free and clear of her interest. But "[t]he parties could not confer such jurisdiction [to modify a fixed and unmodifiable property division] even by consent or failure to object." *Van Diepen v. Van Diepen*, 73 S.D. 366, 369, 43 N.W.2d 499, 500 (1950).

not subject to modification." *Sjomeling*, 472 N.W.2d at 489. *See also Hiller*, 2015 S.D. 58, ¶ 12, 866 N.W.2d at 541; *Beermann*, 526 N.W.2d at 129. Because the August 2015 order improperly modified the June 2014 property division, we reverse the circuit court's order to the extent it converted Jeffrey's property obligation to alimony and awarded Jeffrey the business free and clear of Kelly's interest. However, we affirm the order to the extent Jeffrey must pay Kelly a $100,162 property-equalization payment under the court's installment terms.

*Contempt*

[¶23.]     Jeffrey argues that the circuit court erred in finding him in contempt because the court did not enter any findings that he acted in willful or contumacious disobedience of a court order. The record reflects that the court entered no findings of fact on any elements of contempt: contempt is mentioned only in an insubstantial manner in two conclusions of law. Jeffrey contends that the lack of any findings on the elements of contempt[4] requires reversal of the court's decision. We agree. "Without a thorough recitation of facts that support a finding of contempt and without a finding that the four elements of contempt are present, a conclusion that contempt of court has occurred is improper." *Talbert v. Talbert*, 290 N.W.2d 862, 864 (S.D. 1980). Even if we assume the court considered the relevant factors, a judgment of contempt "must be based upon clear and specific findings of fact as to

---

4.     "The required elements for a finding of civil contempt 'are (1) the existence of an order; (2) knowledge of the order; (3) ability to comply with the order; and (4) willful or contumacious disobedience of the order.'" *Harksen v. Peska*, 2001 S.D. 75, ¶ 12, 630 N.W.2d 98, 103 (quoting *Thomerson v. Thomerson*, 387 N.W.2d 509, 512-13 (S.D. 1986), *abrogated on other grounds by Sazama v. State*, 2007 S.D. 17, 729 N.W.2d 335).

all material elements." *Mundlein v. Mundlein*, 2004 S.D. 25, ¶ 9, 676 N.W.2d 819, 822 (emphasis omitted) (quoting *Thomerson v. Thomerson*, 387 N.W.2d 509, 513 (S.D. 1986), *abrogated on other grounds by Sazama v. State*, 2007 S.D. 17, 729 N.W.2d 335). We reverse and remand for the entry of findings of fact and conclusions of law on contempt.

*Attorney's Fees*

[¶24.]     By notice of review, Kelly argues that the circuit court abused its discretion in denying her request for attorney's fees and costs. She points out that the court found Jeffrey in contempt. She contends that "[t]he failure to award Kelly her attorney's fees will leave Jeff with the impression that there are no consequences for his failure to abide by the court's orders." She further contends that the court failed to consider whether an award of fees was necessary and reasonable before it denied her request.

[¶25.]     The circuit court may award a party attorney's fees under SDCL 15-17-38. The decision to award fees is within the court's discretion. *Kappenman v. Kappenman*, 522 N.W.2d 199, 202 (S.D. 1994). In making the decision, "[a] two-step analysis is typically used." *Nickles v. Nickles*, 2015 S.D. 40, ¶ 34, 865 N.W.2d 142, 154.

> First, the court must determine what constitutes a reasonable attorney's fee. This requires consideration of (1) the amount and value of the property involved, (2) the intricacy and importance of the litigation, (3) the labor and time involved, (4) the skill required to draw the pleadings and try the case, (5) the discovery utilized, (6) whether there were complicated legal problems, (7) the time required for the trial, and (8) whether briefs were required. Second, it must determine the necessity for such fee. That is, what portion of that fee, if any, should be allowed as costs to be paid by the opposing party. This requires

> consideration of the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case.

*Id.* (quoting *Huffaker v. Huffaker*, 2012 S.D. 81, ¶ 32, 823 N.W.2d 787, 794).

[¶26.] "This Court has consistently required trial courts to enter findings of fact and conclusions of law when ruling on a request for attorney fees. Without findings of facts and conclusions of law there is nothing to review." *Id.* ¶ 35 (quoting *Crisman v. Determan Chiropractic, Inc.*, 2004 S.D. 103, ¶ 30, 687 N.W.2d 507, 514). Here, the court did not enter findings of fact and conclusions of law in denying Kelly's request for attorney's fees. Because there are no findings to review, and because we are reversing and remanding on the issue of contempt, the circuit "court should reconsider the award of attorney fees under the two-step analysis set forth by this Court." *See Huffaker*, 2012 S.D. 81, ¶ 33, 823 N.W.2d at 795.

*Appellate Attorney's Fees*

[¶27.] Both parties moved this Court for an award of appellate attorney's fees under SDCL 15-26A-87.3 and included separate verified, itemized statements of legal services rendered. Considering the merits of the issues raised on appeal, we award Kelly $7,592.13 in fees and decline to award attorney's fees to Jeffrey.

[¶28.] Reverse and remand.

[¶29.] GILBERTSON, Chief Justice, and SEVERSON, WILBUR, and KERN, Justices, concur.