2005 SD 58

**Sylvia F. MIDZAK, Plaintiff and Appellee,**

v.

**Andrew Z. MIDZAK, Defendant and Appellant.**

No. 23280.

Supreme Court of South Dakota.

Considered on Briefs Feb. 15, 2005.

Decided May 11, 2005.

Angela M. Colbath, Rapid City, South Dakota, Attorney for plaintiff and appellee.

Paul Winter, Winter & Koch, Rapid City, South Dakota, Attorney for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.] Wife sought and was granted divorce on the grounds of extreme emotional cruelty. Wife was awarded the marital home, along with most of the marital assets. The trial court awarded no alimony at the time of the divorce, but reserved the right to award alimony in the future if the circumstances of the parties required it. Primary physical custody of the parties' minor child was awarded to Husband contingent on finding a suitable place to live. No award of child support was made. Husband appealed the grant of the divorce on the grounds of extreme emotional cruelty, the division of marital assets, the future award of alimony, and the failure to award child support. We affirm in part and reverse and remand in part.

**FACTS AND PROCEDURE**

[¶ 2.] Sylvia Midzak (Sylvia) and Andrew Midzak (Andrew) were married in 1980. At the time of the marriage, Andrew had served in the United States Air Force for four years and was twenty-two; Sylvia was twenty-one. Over the next sixteen years, Andrew's career required the family to move to several different duty stations, with the family eventually settling in Rapid City, South Dakota. During the marriage the parties had three children, Nicholas born in 1983, Joseph born fifteen months later, and G.M. born in 1988. Sylvia began operating a craft business from the family home after the birth of the parties' last child. Sylvia began working outside the home in 2000, and eventually began working three part-time jobs.

[¶ 3.] After twenty years of service in the Air Force, Andrew retired with a full pension in the fall of 2000. In March of 2001, Andrew took a job overseas in Hungary as a flight controller, a job that paid approximately $81,000 per year. The contract position was intended to last approximately two years. Testimony was given at trial by Andrew and by Nicholas that the family discussed and agreed that the purpose behind Andrew taking the position in Hungary was to make enough money to pay for the college education of all three children.

[¶ 4.] Andrew returned to Rapid City three times for visits during the two and one-half year period he was employed in Hungary, and the family traveled to Hungary for one visit. In October 2003, Andrew returned from Hungary at the conclusion of the contract term. Andrew was unemployed at the time he returned, but had been offered another air controller position in Turkey at a salary of $100,000. Andrew offered testimony at trial that he was unable to obtain comparable employ-

ment in the Rapid City area. Andrew's only local employment opportunities were as a common laborer at a starting wage of nine dollars and fifty cents per hour.

[¶ 5.] On November 13, 2003, Sylvia filed for divorce alleging irreconcilable differences or in the alternative extreme emotional cruelty. Andrew denied the allegation of extreme emotional cruelty, and contested the divorce. Trial on the matter was held on January 29, and February 6, 2004. At trial, Andrew appeared pro se and Sylvia was represented by counsel. The following exchange occurred just prior to the conclusion of Sylvia's case-in-chief:

THE COURT: When is the last time you told your wife that you loved her?

ANDREW: Probably three years ago.

THE COURT: When is the last time you told your husband you loved him?

SYLVIA: I told him last summer.

ANDREW: Well, see, that's a contradiction here—

THE COURT: No, there is no contradiction.

ANDREW: There are emails about being forced to come over to Hungary to spend some time with me—

THE COURT: For purposes of the divorce, I've heard absolutely enough.

MS. COLBATH: I have no other evidence on any issue.

ANDREW: Sir, when you say for purposes of the divorce, you're making a decision on the divorce?

THE COURT: I'm going to let you testify, but I just want you to know that what I have heard so far is I believe that your personality and your demeanor and your response to your wife is in fact authoritarian in nature and I believe that from what I have seen in the courtroom this afternoon on the topics we have discussed, that you and your wife have met the re-

quirements of the law to establish there has been grievous mental suffering inflicted upon her by you, so I'm going to let you continue, you can testify to *convince me that I am wrong,* but I have a feeling, sir, that your testimony will be more of the fact that she's wrong and her perceptions are incorrect and she has misunderstood.

ANDREW: I have always suggested or tried to benefit the family by my directions and suggestions.

THE COURT: I think I'll hear you tell me that again, because you tell me that in your questioning of all the witnesses.

ANDREW: Is there any sense for me to stand up?

THE COURT: Well, that's up to you. I'm just telling you what I have seen in four hours leads me to conclude that they have definitely in my mind now established the statutory grounds for divorce.

ANDREW: Does that somehow finalize the child support—

THE COURT: No—

ANDREW: Custody?

THE COURT: No, not at all . . .

[¶ 6.] The trial judge then engaged in a conversation with Sylvia's counsel as to exhibits, and Sylvia's proposed alimony and property award. Andrew then asked the trial court if he could continue cross-examining Sylvia:

ANDREW: Do I still have questioning for her or not?

THE COURT: I think I have heard enough. You haven't given your testimony.

[¶ 7.] Andrew elicited testimony from his two oldest children, and then gave his own testimony. As Andrew gave his testi-

mony, the court transitioned him from testifying about the facts surrounding the marriage to the matter of marital assets and valuations.

[¶ 8.] The trial court turned to the matter of reviewing financial exhibits and establishing valuations on property. The trial court indicated at that time that the $5,000 Sylvia removed from a joint checking account prior to filing for divorce for purposes of purchasing a new car was included in the property list, and the new car would be listed as well. However, in the trial court's findings of fact and conclusions of law neither asset was listed.

[¶ 9.] The trial court did not include Andrew's retirement pay as a marital asset, but instead allocated $570.00 of the total monthly benefit of $968.31 to Sylvia, leaving $376 per month for Andrew. The trial court then included inheritance gifts of $20,000 made to Andrew by his mother in the list of marital assets.

[¶ 10.] In its written findings of fact and conclusions of law, the trial court stated it had awarded the marital home to Sylvia, as Andrew had unequivocally ceded numerous items of property to Sylvia during the proceedings. The trial court's final division of the marital assets as contained in the findings of fact and conclusions of law resulted in an award of $128,100 to Sylvia and $57,000 to Andrew.

[¶ 11.] The trial court awarded custody of the minor child G.M. to Andrew, but no child support was awarded. The award of physical custody was conditioned on Andrew finding a suitable place to reside in Rapid City. The need for a new residence was created by the trial court's decision to award the marital home to Sylvia. The trial court did calculate Sylvia's living expenses and income, including the $570.00 awarded per month from Andrew's retirement pay. No similar calculation was undertaken for Andrew's living expenses.

[¶ 12.] In its conclusions of law, the trial court held that Andrew had inflicted grievous mental suffering upon Sylvia during the marriage, and granted Sylvia's petition for divorce. The court then reserved the right to grant an award of alimony in the event that the parties' circumstances changed. The court held its division of property was fair and equitable as a matter of law, and that Andrew made a free and voluntary waiver to any claim of much of the marital property.

[¶ 13.] Andrew appealed raising four issues for our review:

1. Whether it was error for the trial court to state from the bench during the trial that the court had tentatively decided the question of granting the divorce in favor of Sylvia before hearing Andrew's case-in-chief.

2. Whether the trial court abused its discretion in distributing the marital property.

3. Whether it was error to reserve the right to award alimony to Sylvia.

4. Whether it was error for the trial court not to order child support.

**STANDARD OF REVIEW**

[¶ 14.] The trial court's findings of fact establishing grounds for divorce are not disturbed on appeal absent clear error. *Hybertson v. Hybertson,* 1998 SD 83, ¶ 8, 582 N.W.2d 402, 404 (citing *Osman v. Keating–Osman,* 521 N.W.2d 655, 657 (S.D.1994)). "Clear error is shown only when, after a review of all the evidence, 'we are left with a definite and firm conviction that a mistake has been made.'" *New Era Mining Co. v. Dakota Placers, Inc.,* 1999 SD 153, ¶ 7, 603 N.W.2d 202, 204 (citing *Rabenberg v. Rigney,* 1999 SD 71, ¶ 4, 597 N.W.2d 424, 425 (quoting *Cleveland v. Tinaglia,* 1998 SD 91, ¶ 16, 582

N.W.2d 720, 724.)). We give the trial court's opportunity to judge the credibility of witnesses and to weigh their testimony due regard when reviewing the trial court's findings of fact. *Meldrum v. Novotny*, 2002 SD 15, ¶ 18, 640 N.W.2d 460, 463 (citing *Langerman v. Langerman*, 336 N.W.2d 669, 670 (S.D.1983)). We review the trial court's application of law to fact under the de novo standard of review, with no deference to the circuit court's decisions. *Mundlein v. Mundlein*, 2004 SD 25, ¶ 5, 676 N.W.2d 819, 821 (citing *City of Deadwood v. Summit, Inc.*, 2000 SD 29, ¶ 9, 607 N.W.2d 22, 25) (citations omitted).

■ [¶ 15.] Our standard of review for challenges to a trial court's alimony award is well settled. *Evans v. Evans*, 1997 SD 16, ¶ 31, 559 N.W.2d 240, 247(citing *Dussart v. Dussart*, 1996 SD 41, ¶ 9, 546 N.W.2d 109, 111; *DeVries v. DeVries*, 519 N.W.2d 73, 77 (S.D.1994)). We apply the abuse of discretion standard to alimony awards, and will not disturb the trial court's decision unless it clearly appears that the trial court abused its discretion. *Id.*

■ [¶ 16.] The abuse of discretion standard of review is also applied to property settlements. *Id.* ¶ 23, 559 N.W.2d at 245 (citing *Vander Pol v. Vander Pol*, 484 N.W.2d 522, 524 (S.D.1992); *Kanta v. Kanta*, 479 N.W.2d 505 (S.D.1991); *Johnson v. Johnson*, 471 N.W.2d 156 (S.D. 1991); *Fox v. Fox*, 467 N.W.2d 762 (S.D. 1991)). "The omission of assets which should properly be included as marital property is an abuse of discretion." *Id.* (citing *Gibson v. Gibson*, 437 N.W.2d 170, 171 (S.D.1989)) (citations omitted). Additionally, a trial court must consider the alimony and property division together. *Id.* ¶ 31, 559 N.W.2d at 247 (citing *Kappenmann v. Kappenmann*, 479 N.W.2d 520, 523 (S.D.1992); *Ryken v. Ryken*, 461 N.W.2d 122, 127 (S.D.1990)).

■ [¶ 17.]Similarly, this Court will not disturb the award or denial of child support unless it clearly appears from the record that the trial court abused its discretion. *Billion v. Billion*, 1996 SD 101, ¶ 14, 553 N.W.2d 226, 230 (citing *Vander Pol*, 484 N.W.2d 522) (citations omitted). This Court has statutory authority to revise all orders and decrees "touching the alimony and maintenance of a spouse, and for the custody, education, and support of the children ..., including those which are stated to be in the discretion of the court." SDCL 25-4-46.

## ANALYSIS AND DECISION

[¶ 18.]   **1.   Whether it was error for the trial court to state from the bench during the trial that the court had tentatively decided the question of granting the divorce in favor of Sylvia before hearing Andrew's case-in-chief.**

■ [¶ 19.] The plaintiff in a civil proceeding bears the burden of proving every material allegation in his or her complaint. *Farmers' State Bank of Turton v. Van Houten*, 52 S.D. 528, 532, 219 N.W. 206, 207 (1928) (citing *Scott Co. v. Scheidt*, 35 N.D. 433, 160 N.W. 502 (1916)). A plaintiff is required to establish a prima facie showing, meaning sufficient evidence which would entitle the plaintiff to recover if the defendant produced no evidence. *Peters v. Lohr*, 24 S.D. 605, 610, 124 N.W. 853, 855 (1910) (citation omitted). The burden of persuasion rests throughout the litigation on the party asserting the affirmative of a particular issue, although the burden of production may shift from party to party as the case progresses. *Gordon v. St. Marys Healthcare Center*, 2000 SD 130, ¶ 24, 617 N.W.2d 151, 158 (quoting *Hayes v. Luckey*, 33 FSupp2d 987, 990 (N.D.Ala.1997)). After a plaintiff makes a prima facie showing of the issue in conten-

tion, the defendant who enters a general denial must then present testimony, or the plaintiff will prevail on the claim by virtue of the prima facie showing. *Peck v. Peck,* 51 S.D. 157, 164, 212 N.W. 872, 875 (1927). Thus, the defendant who enters a general denial is said to have the burden of advancing with testimony, or the burden of production. *Id.*

[¶ 20.] The trial court could have perhaps been more articulate in its comments from the bench at the close of Sylvia's case-in-chief. However, a fair reading of the proceeding indicates the trial court was attempting to inform Andrew that Sylvia had satisfied her requirement that she present evidence to the court to constitute a prima facie case on the issue of divorce. The trial court was attempting to inform Andrew that it was now his evidentiary opportunity and responsibility to rebut that prima facie case. We affirm on the trial court's grant of the divorce to Sylvia.

[¶ 21.] **2. Whether the trial court abused its discretion in distributing the marital property.**

[¶ 22.] South Dakota is an "all property state," meaning that "all property of either or both divorcing parties is subject to equitable division by the court, regardless of title or origin." *Evans,* 1997 SD 16, ¶ 23, 559 N.W.2d at 245 (citing *Endres v. Endres,* 532 N.W.2d 65, 68 (S.D.1995) (quoting *Radigan v. Radigan,* 465 N.W.2d 483, 486 (S.D.1991))). The trial court's discretion to divide property between the former spouses must be soundly and substantially based on evidence. *Id.* (citing *Gibson,* 437 N.W.2d at 171; *Goehry v. Goehry,* 354 N.W.2d 192 (S.D.1984); *Owen v. Owen,* 351 N.W.2d 139 (S.D.1984)). We have repeatedly held that retirement accounts and pensions, including military pensions, must be treated as marital assets and divided between the

parties. *Gibson,* 437 N.W.2d at 171 (citing *Caughron v. Caughron,* 418 N.W.2d 791 (S.D.1988); *Hautala v. Hautala,* 417 N.W.2d 879 (S.D.1988); *Arens v. Arens,* 400 N.W.2d 900 (S.D.1987); *Stubbe v. Stubbe,* 376 N.W.2d 807 (S.D.1985)).

[¶ 23.] In the instant case, evidence was introduced that Sylvia removed $5,000 from a joint checking account to purchase a new vehicle. However, it is unclear from the record whether the withdrawal occurred prior to or after Sylvia filed for divorce. Despite the ample evidence presented by Sylvia herself of the origin of the funds and the subsequent purchase, the trial court did not include a finding of fact as to the whether they were marital assets to be included in the property division, or Sylvia's separate assets. The assets are simply unaccounted for in the final analysis. At the very least, the trial court should include the car and its loan in the listing of marital assets and liabilities, and make an award of both to Sylvia. Regardless of whether or not the loan value exceeds the book value of the car, the decree should include the fact as determined by the trial court that Andrew will not be liable for the debt incurred for the loan on the car and that the asset belongs to Sylvia.

[¶ 24.] In its findings of fact, the trial court determined that Andrew freely, voluntarily and knowingly waived his rights to the marital residence and other marital property during the trial.[1] However, the evidence does not unequivocally indicate such a waiver was made with regard to the marital home. The trial court took testimony first from Sylvia regarding the value of the marital home, and then later in the trial from Andrew. The trial court then told Andrew the marital home was "to be awarded to the Plaintiff."

---

1. As an example, Andrew stipulated that Sylvia receive one half of his

Military retirement or $570 per month.

After the fact, Andrew merely replied "Fine." It is not clear if Andrew was acknowledging the trial court's valuation, its decision to award the home to Sylvia, waiving rights to the property as found by the court or merely acknowledging he heard what the trial court has said. The trial court abused its discretion in not properly determining the status of all assets first as either separate or marital, and then making an equitable distribution of all assets determined to be marital in nature.

[¶ 25.] **3. Whether it was error to reserve the right to award alimony to Sylvia.**

[¶ 26.] A trial court may modify an award of periodic alimony. *Saxvik v. Saxvik*, 1996 SD 18, ¶ 11, 544 N.W.2d 177, 180. However, a trial court loses jurisdiction to award alimony in the future if the trial court "found no basis for an award of alimony to begin with." *Id.* ¶ 15. This is so because a court cannot "modify 'what never existed.'" *Id.* (citing *Cameron v. Cameron*, 31 S.D. 335, 340, 140 N.W. 700, 701–02 (1913)).[2]

[¶ 27.] In the instant case, the trial court did not award Sylvia alimony and gave as its reason Andrew's unemployment. The trial court then proceeded to

"reserve the right to award alimony to [Sylvia] if [Andrew] becomes employed."

[¶ 28.] The trial court is without jurisdiction to amend a non-existent alimony award at some point in the future if it denies alimony at the time of the divorce trial and does not expressly reserve the right to award it in the future. As the trial court recognized the modest financial circumstances Andrew found himself at the time of trial but also his likely potential to again regain employment with a significant income,[3] it did not abuse its discretion in reserving unto itself the option to award alimony in the future. *See Cameron*, 31 S.D. 335, 140 N.W. 700.

[¶ 29.] **4. Whether it was error for the trial court not to order child support.**

[¶ 30.] The South Dakota child support statutory scheme requires that "the combined monthly net incomes of both parents *shall be* used in determining the obligation and divided proportionately between the parents based upon their respective net incomes." SDCL 25–7–6.2 (emphasis added). The trial court is required to calculate the parents' monthly net income, which is equal to gross income less allowable deductions, as codified at

---

2. In *Saxvik*, we concluded that where a trial court originally awards alimony of a type that can be modified in the future, it retains jurisdiction to so modify. 1996 SD 18, ¶ 11, 544 NW2nd at 179. This would include the authority to reduce it to zero in the future should circumstances justify this. *Id.* ¶ 11–12. A subsequent reduction to zero would not deny the trial court the jurisdiction at a further point from re-instating it. *Id.* However, we made it clear that this modification authority does not apply where the trial court refuses to award alimony to begin with as part of the divorce proceeding. *Id.* ¶ 15, 544 NW2nd at 180 (citing *Cameron*, 31 S.D. 335, 140 N.W. 700 (1913)).

3. The trial court entered the following finding of fact on this point:

> [Andrew] currently has only prospective employment, but is currently unemployed therefore alimony cannot be awarded at this time. However, [Sylvia] has significant monthly obligations and has far lower earning capacity than [Andrew]. The Court reserves the right to award alimony to [Sylvia] if [Andrew] becomes employed.

The trial court then made the appropriate specific reservation unto itself of the right to award future alimony:

> The court reserves the right to grant an award of alimony in the event that present circumstances change. In that event, an award of alimony may be appropriate in accord with SDCL 25–4–41, given the circumstances of the parties.

SDCL 25–7–6.3 and 25–7–6.7. Deviations from the support obligation schedule at SDCL 25–7–6.2 are possible, but must be raised by the parties in order to be considered by the trial court. SDCL 25–7–6.10. Additionally, deviations may be made "only upon the entry of specific findings" on any of the statutory factors included in SDCL 25–7–6.10.[4] *Id.*

[¶ 31.] Neither party raised the issue of a deviation from the standard schedule in SDCL 25–7–6.2. Nor did the trial court take evidence and make specific findings on any of the eight factors that permit a deviation under SDCL 25–7–6.10. The trial court abused its discretion by failing to follow the mandatory provisions of the South Dakota child support statutory scheme.

[¶ 32.] We affirm the divorce and reverse the trial court and remand the case for proper fact finding and application of the laws of South Dakota on property division and child support.

[¶ 33.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

4. SDCL 25–7–6.10 provides in relevant part: Deviation from the schedule in § 25–7–6.2 *shall be* considered if raised by either party and made only upon the entry of specific findings based upon any of the following factors:

(1) The income of a subsequent spouse or contribution of a third party to the income or expenses of that parent but only if the application of the schedule works a financial hardship on either parent;

(2) Any financial condition of either parent which would make application of the schedule inequitable;

(3) The federal income tax consequences arising from claiming the child as a dependent;

(4) Any special needs of the child;

(5) For agreements entered into prior to July 1, 1986, if it is established by clear and convincing evidence, that debts or property were exchanged for child support and it appears equitable to continue such arrangement;

(6) The effect of agreements between the parents regarding extra forms of support for the direct benefit of the child;

(7) The obligation of either parent to provide for subsequent natural children or stepchildren. However, an existing support order may not be modified solely for this reason; or

(8) The voluntary act of either parent which reduces that parent's income.

(emphasis added).