#28879, #29160-a-MES
**2020 S.D. 62**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

TIMOTHY JOHN EVENS,            Plaintiff and Appellee,

    v.

RACHEL JOANNA EVENS,           Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JEFFREY R. CONNOLLY
Judge

\* \* \* \*

MITCHELL D. JOHNSON
Rapid City, South Dakota

DAVID M. DILLON
Rapid City, South Dakota           Attorneys for plaintiff
                                            and appellee.

RACHEL EVENS
Florence, Montana           Pro se defendant and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
APRIL 20, 2020
OPINION FILED **11/04/20**

SALTER, Justice

[¶1.] Rachel Evens appeals the circuit court's judgment and decree of divorce entered on the grounds of extreme cruelty as well as its determinations regarding child custody, property division, child support, and attorney fees and costs. Rachel also appeals the court's subsequent contempt order against her. We affirm.

## Background

[¶2.] Rachel Evens and Tim Evens were married in 2005 and have four minor children. At the time of their marriage, the couple lived in Havre, Montana, where Tim owned and operated a carpet cleaning business, known as Tim Evens Carpet Care. Tim also worked for the Havre Fire Department and had previously retired from the Havre Police Department. Rachel began working for Tim's carpet cleaning business prior to their marriage. Tim later incorporated the business and gave Rachel a 90% ownership interest.

[¶3.] Rachel obtained her master's degree in nursing and completed training to become a certified nurse midwife while the family resided in Havre. She remained a stay-at-home mother until the parties moved to Rapid City in 2014, where she took a position as a nurse midwife with the Native Women's Health Clinic. The parties sold the equipment for their carpet cleaning business before moving from Montana but retained the name Tim Evens Carpet Care, Inc., and started a similar business under the same name in South Dakota. After he moved to Rapid City, Tim retired from the Havre Fire Department and became a stay-at-

home father. He completed some carpet cleaning and restoration work as his schedule allowed.

[¶4.] Rachel's employment with the Native Women's Health Clinic ended in April 2017, and she subsequently accepted a nurse midwife position in Wolf Point, Montana, which is 375 miles away from Rapid City. Rachel brought the parties' four children along during her two-week rotation, which was a significant source of marital stress. Tim objected to the children's long absences from him and alleged the children were unsupervised for long periods of time, including overnights, while Rachel worked.[1] When Rachel's employment in Wolf Point ended one year later, she took a position in Big Fork, Montana, approximately 760 miles away from Rapid City.

[¶5.] Tim commenced this divorce action in January 2018, alleging irreconcilable differences or, in the alternative, extreme cruelty. Tim also requested primary physical custody of the children, equitable division of the parties' assets, and child support.

[¶6.] On March 6, 2018, Tim moved for interim custody of the children and exclusive possession of the parties' Rapid City home.[2] That same day, Rachel sought and obtained an ex parte temporary protection order based on her allegations that Tim had physically and sexually assaulted her. Rachel removed the children from their schools in Rapid City and took them to Montana. Following

---

1. The children were 11, 9, 8, and 4 when Tim alleged that Rachel would leave them unsupervised overnight.

2. The parties still owned their home in Havre when Tim initiated divorce proceedings.

an evidentiary hearing on March 23, 2018, the court found that Rachel's testimony was not credible and denied her request for a permanent protection order. The court also awarded Tim interim custody of the children and exclusive possession of the Rapid City marital home.

[¶7.] Rachel requested another evidentiary hearing regarding interim custody, which the circuit court allowed. However, the court did not change its ruling and again granted Tim interim custody, citing concerns about what the court later described as Rachel's "combative and aggressive actions and words directed towards both Tim and the children . . . ." The court did order reasonable parenting time for Rachel, but unfortunately, their efforts to exchange the children were often contentious and reflected an elevated level of conflict.

[¶8.] The facts as later found by the circuit court following trial describe in direct terms Rachel's conduct concerning two specific exchanges. The first occurred on August 12, 2018. Rachel had the children with her in Big Fork, Montana, and advised Tim she would not bring the children to the designated mid-point location for the exchange. Tim elected to travel the entire 750 miles from Rapid City to Big Fork to get the children, but when he arrived and asked the children to gather their things and get in his vehicle, Rachel told the children to go watch a movie in the basement of her home. For the next 75 minutes, Rachel prevented Tim's departure by taking the keys to his vehicle and physically engaging him by pushing and pulling him inside of her house and in the presence of the children. The court relied upon the facts of the August 12 incident to support its finding that "Rachel is the

dominant player between the parties. She will resort to physical confrontation, manipulation, and aggression to get what she wants."

[¶9.]     The circuit court also related the facts of a similar incident which occurred on September 3, 2018. Although Rachel had brought the children to the mid-point exchange location in Big Timber, Montana, she told them they did not have to return to Rapid City with their father. She then advised Tim that she had unilaterally enrolled the children in school in Big Fork and that they would begin attending the next day. Tim sought the assistance of a local sheriff's deputy, but they were unable to locate Rachel in Big Timber. She was eventually located at a home in Helena, Montana. Rachel ultimately yielded and exchanged the children after contact with the court. Tim finally started out for Rapid City from Helena at 7:00 p.m. and arrived home at 3:50 a.m. on September 4. Three of the children had school that day and boarded the bus at 6:45 a.m.

[¶10.]     During this pretrial period, Rachel was represented by four different attorneys, each of whom subsequently moved to withdraw shortly after noting their appearances. Rachel represented herself at trial and on appeal.

[¶11.]     Following a five-day court trial in November 2018, the circuit court granted Tim a divorce on the grounds of extreme cruelty, finding that Rachel had physically and mentally abused him during their marriage. The court cited instances in which Rachel had berated Tim, assaulted him physically, and referred to him in demeaning and incendiary terms. In an October 2017 incident, the couple was with other members of Rachel's family for dinner at a restaurant when Rachel loudly accused Tim of extramarital affairs, causing other patrons to take notice.

After dinner, Rachel told Tim she was going out to find a man to satisfy her, only to return later to taunt him by advising him she had succeeded in her effort. The court also accepted the testimony of several witnesses who confirmed that Rachel was demeaning and disrespectful to Tim. Both before the divorce action and during its pendency, Rachel accused Tim of raping her, failing to pay taxes and hunting without a license, all of which the court determined were unsupported by the evidence.

[¶12.] The court assessed the children's best interests and awarded Tim primary physical custody of the children, allowing Rachel parenting time which generally aligned with the South Dakota Parenting Guidelines. The court calculated Rachel's child support obligation at $1,132 per month.

[¶13.] With regard to marital property, the circuit court awarded Tim the marital home in Rapid City as well as all interest in the carpet restoration businesses.[3] The court further ordered that "the parties shall execute and deliver any such instruments (e.g. Deeds, Certificates of Title and Stock Certificates) as may be required in order to carry out the intentions and provisions of the court orders within 30 days after the court's judgment and decree of divorce." The court ordered the sale of the former marital home and development lots the parties owned in Havre with the net proceeds to be split equally after deducting mortgage payments and costs Tim had incurred prior to the sales.

---

3.   Utilizing her 90% equity interest in Tim Evens Carpet Care, Inc., Rachel fired Tim in April 2018. Tim subsequently started another business, Restoration Resources, LLC.

[¶14.]     The circuit court designated Tim's Montana Police Officer's Retirement Pension as a non-marital asset, reasoning that it was earned entirely before the parties' marriage. The court allocated Tim's pension through the Montana Firefighters Unified Retirement System (FURS) between the parties through the use of a coverture fraction, resulting in Rachel receiving a fixed sum of $799.83 per month for 342 months which represents Tim's remaining life expectancy.[4] The court further ordered the parties' gold coin collection to be split equally, and ordered Tim to pay Rachel an equalization payment of $256,378 within 120 days of the sale of the home and development lots in Havre. Finally, the court determined that Rachel had unnecessarily increased the cost of litigating the case and ordered her to reimburse Tim $15,000 for attorney fees. The court also assessed costs and disbursements against Rachel in the amount of $7,705.24. The total amount of $22,705.24 was credited against Tim's equalization payment.

[¶15.]     Rachel appealed the circuit court's judgment and decree of divorce in January 2019. Tim subsequently asked the court to find Rachel in contempt for "failing to execute and deliver a quitclaim deed" for the Rapid City marital home and "failing to sign, deliver, and transfer stock certificates to Tim Evens Carpet Care, Inc. . . . ." In addition, Tim alleged that Rachel failed to "sign, [and] deliver the certificates of title and transfer ownership" in several motorcycles, trailers, snowmobiles, and a camper awarded to Tim, and failed to provide Tim with half of the gold coins.

---

4.     Tim's FURS retirement did not include a survivor benefit and payments to Rachel will end if Tim passes away before the expiration of the 342-month period.

[¶16.]     Rachel responded by asking the circuit court to stay execution of the judgment pending her appeal.  After conducting two hearings on May 28 and May 30, 2019, the court provisionally granted the motion for a stay based upon a series of conditions, including the obligation that Rachel deposit signed documents transferring ownership of the property awarded to Tim with the Pennington County Clerk of Court.  The court ordered Rachel to comply with the conditions by July 1, 2019.  In the event she did not satisfy the conditions of the stay, the court—with the parties present—scheduled a subsequent hearing for July 17, 2019, "to determine whether [Rachel] had complied" and if not, to proceed with contempt proceedings.

[¶17.]     Rachel did not comply with the conditions of the stay, and despite her actual notice, she also did not attend the July 17, 2019 hearing.  In its subsequent order of contempt,[5] the circuit court found that she had not deposited signed documents transferring ownership with the Pennington County Clerk of Court.  The court, therefore, concluded that the provisional stay created by the June 3 order was no longer in effect, leaving it "free to enforce its judgment and decree of divorce . . . ."  The court found Rachel had the ability to comply with its order and her failure to do so was willful and contumacious.  The contempt order provided that Rachel could purge herself of contempt by: 1) signing and delivering the stock certificates and titles to the personal property it previously awarded to Tim; 2)

---

5.     The circuit court also drafted a 20-page memorandum opinion detailing specific aspects of the May 30, 2019 hearing, including an excerpt from the hearing transcript to support its determination that Rachel had actual notice of the July 17 hearing.  The court also described the contents of a July 22 email from Rachel in which she suggested she had no knowledge of the July 17 hearing, prompting the court's determination that "[a]t best, [Rachel's] melodramatic assertions are disingenuous."

delivering 50% of the gold coins; and 3) paying Tim $4,773.86, which represented his attorney fees for the contempt proceedings, within 30 days.

[¶18.] Somewhat collateral to the contempt litigation, but troubling nonetheless, the circuit court found that Rachel had exhibited a lack of candor when she feigned ignorance of the parties' Montana tax return refund, which had been awarded to Tim. After obtaining information from the Montana Department of Revenue, Tim ultimately established that Rachel had taken the money. Although Rachel eventually reimbursed Tim, the court concluded her actions "were very deceptive" and resulted in unnecessary efforts by Tim "to discover the actual whereabouts of the missing funds."

[¶19.] In addition to her appeal of the circuit court's judgment and decree of divorce, Rachel has also appealed the court's order of contempt. We have consolidated her appeals and restate the issues she presents for review as follows:

1. Whether the circuit court clearly erred when it granted the divorce on the grounds of extreme cruelty.

2. Whether the circuit court abused its discretion when it awarded Tim primary physical custody of the parties' four children.

3. Whether the circuit court abused its discretion when it divided the parties' marital property.

4. Whether the circuit court abused its discretion when it calculated Rachel's child support obligation.

5. Whether the circuit court abused its discretion when it ordered Rachel to pay a portion of Tim's attorney fees and all of his costs.

6. Whether the circuit court clearly erred when it found Rachel in contempt.

**Standard of Review**

[¶20.]     We review a circuit court's determination of the grounds for divorce for

clear error.  *Midzak v. Midzak*, 2005 S.D. 58, ¶ 14, 697 N.W.2d 733, 737.  A "trial

court's findings as to contempt [are also reviewed] under a clearly erroneous

standard."  *Taylor v. Taylor*, 2019 S.D. 27, ¶ 15, 928 N.W.2d 458, 465 (quoting

*Muenster v. Muenster*, 2009 S.D. 23, ¶ 15, 764 N.W.2d 712, 717).  "Clear error is

shown only when, after a review of all the evidence, we are left with the definite and

firm conviction that a mistake has been made."  *Midzak*, 2005 S.D. 58, ¶ 14, 697

N.W.2d at 737 (quoting *New Era Mining Co. v. Dakota Placers, Inc.*, 1999 S.D. 153,

¶ 7, 603 N.W.2d 202, 204).

[¶21.]     Child custody determinations are reviewed for an abuse of discretion.

*Shelstad v. Shelstad*, 2019 S.D. 24, ¶ 20, 927 N.W.2d 129, 134.  "[A]ward[s] of

attorney fees, determinations as to child support, and determinations in the division

of property [are also reviewed] for an abuse of discretion."  *Green v. Green*, 2019 S.D.

5, ¶ 11, 922 N.W.2d 283, 288.  "An abuse of discretion 'is a fundamental error of

judgment, a choice outside the range of permissible choices, a decision, which, on

full consideration, is arbitrary or unreasonable.'"  *Taylor*, 2019 S.D. 27, ¶ 14, 928

N.W.2d at 465 (quoting *Thurman v. CUNA Mut. Ins. Society*, 2013 S.D. 63, ¶ 11,

836 N.W.2d 611, 616).

**Analysis**

***Grounds for Divorce***

[¶22.]     The provisions of SDCL 25-4-2 authorize a divorce on the grounds of

extreme cruelty, which SDCL 25-4-4 defines as "the infliction of grievous bodily

injury or grievous mental suffering upon the other, by one party of the marriage."

"In a marital setting, the definition of extreme cruelty differs according to the personalities of the parties involved. [Courts] must view the evidence in light of the full context of the marriage and not in the narrow light of isolated incidents." *Scherer v. Scherer*, 2015 S.D. 32, ¶ 15, 864 N.W.2d 490, 496 (quoting *Rykhus v. Rykhus*, 319 N.W.2d 167, 169 (S.D. 1982)).

[¶23.]     Here, the circuit court made detailed findings of fact and conclusions of law as part of its decision to grant Tim's request for divorce on the grounds of extreme cruelty. Specifically, the court found that Rachel had physically abused Tim, including hitting, slapping, and kneeing him, as well as spitting in his face. The court also found Rachel had mentally abused Tim by calling him several names, including "stupid, dumb" and a "prick of a man." Rachel also told Tim that she was going to find someone else to satisfy her while also accusing him of having extramarital affairs and leveling unsupported allegations that he had committed serious criminal misconduct. The court credited testimony from several witnesses who relayed derogatory comments Rachel made about Tim to her family, the parties' children, and their friends. This behavior, the court found, had continued throughout the marriage with more frequent, escalating incidents over time. As a result, the court found that "Rachel's conduct toward Tim during this marriage has caused Tim great pain, anxiety, stress, grievous mental and physical suffering and constitutes extreme cruelty."

[¶24.]     Rachel argues on appeal that the circuit court committed error by incorrectly assessing the credibility of the witnesses and weighing the evidence.

These arguments, however, overlook our standard of review which "reflects both the primacy of the court's fact-finding role and our inclination to reverse only those findings that are clearly erroneous." *Hiller v. Hiller*, 2018 S.D. 74, ¶ 22, 919 N.W.2d 548, 555. Indeed, "[t]he credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the circuit court and we give due regard to the circuit court's opportunity to observe the witnesses and the evidence." *Id.* (quoting *McCollam v. Cahill*, 2009 S.D. 34, ¶ 6, 766 N.W.2d 171, 174). We therefore conclude that the circuit court's finding of extreme cruelty as a ground for divorce is not clearly erroneous.

### *Child Custody Determination*

[¶25.] Circuit courts apply "[t]he best interest of the child standard . . . when parents seek an initial judicial determination of the custody of their children." *Kreps v. Kreps*, 2010 S.D. 12, ¶ 26, 778 N.W.2d 835, 843. "[T]he children's temporal, mental, or moral welfare [is considered] in determining the best interests of the children." *Id.* Though not required, circuit courts determining the best interests of the children may consider a structured list of factors, including "parental fitness, stability, primary caretaker, child's preference, harmful parental misconduct, separating siblings, and substantial change of circumstance." *Id.* (quoting *Pietrzak v. Schroeder*, 2009 S.D. 1, ¶ 41, 759 N.W.2d 734, 744) (citing *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, ¶ 24, 591 N.W.2d 798, 807-10). With regard to parental fitness, a court may consider each parent's:

> (1) mental and physical health;
>
> (2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs;

(3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed;

(4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent;

(5) commitment to prepare the child for responsible adulthood, as well as to [e]nsure that the child experiences a fulfilling childhood; and

(6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

*Id.* (quoting *Pietrzak*, 2009 S.D. 1, ¶ 41, 759 N.W.2d at 744).

[¶26.]      Here, the circuit court had the benefit of a report from a child custody evaluator who the court determined to be qualified and credible. The court used the report and the substantial volume of evidence adduced at trial to make detailed findings for each of the factors implicated by its analysis of the children's best interests.

[¶27.]      With regard to each parent's fitness, temporal, mental, and moral welfare, the circuit court concluded that "while neither party has a significant advantage in this area Rachel's mental health issues need to be addressed to avoid harm to the children." The court further determined that "neither party had an advantage" in its consideration of their "capacity and disposition to provide the children with protection, food, clothing, medical care, and other basic needs." However, the court did find Tim had a "strong and substantial advantage" regarding the court's inquiry into the parties' "willingness to maturely encourage and provide frequent and meaningful contact between the child[ren] and the other parent." In support of this finding, the court detailed specific instances of Rachel's

quarrelsome behavior, including the August 12 and September 3 efforts to exchange the children. The court summarized its concerns by finding that "it is painfully obvious that Rachel will not promote nor even remotely foster the relationship between Tim and the children and will continue to embroil the children in the case."

[¶28.] The circuit court acknowledged that the custody evaluator did not find an advantage for either party concerning their "commitment to prepare the child[ren] for responsible adulthood, as well as to ensure that the child[ren] experience[] a fulfilling childhood[.]" But the court found that "Rachel has exposed the children to parental conflict and makes it difficult for the children to feel free to love both parents." With regard to "exemplary modeling so that the child[ren] witness[] firsthand what it means to be a good parent, a loving spouse, and a responsible citizen," the court found that Tim has a "significant advantage[.]" The court specifically found that "Rachel has shown an extraordinary inability to keep the children out of the adult issues between her and Tim." In its findings on stability, the court determined that while neither party had an advantage, "Rachel's mental stability is a pervasive concern across all factors."

[¶29.] The circuit court found Tim had an advantage regarding the children's "adjustment to home, school, and community," further explaining that the children "are appropriately adjusted in Rapid City [with] friends and a support system . . . ." Concerning the "attachment between parent and child," the court did not find either parent had an advantage, and believed that the children "seem appropriately attached to both parents[.]" However, the court found that "Rachel's inability to separate the children's needs from her own is very concerning." The court also

found that Rachel's "negative and physically aggressive conduct and . . . demeanor towards Tim [that] occurred in the presence of the children must be consider[ed] harmful parental misconduct [that] negatively impacts children."

[¶30.]     The circuit court's comprehensive custody analysis includes over 300 findings directed to determining the children's best interests. These findings are supported by the record, and we conclude that the court did not abuse its discretion by granting primary custody to Tim.

[¶31.]     Rachel's argument to the contrary is based on the claim that her role as the primary caregiver should be accorded determinative weight. Our cases do not support this view, however. *See Kreps*, 2010 S.D. 12, ¶ 29, 778 N.W.2d at 844 (rejecting argument that the primary caretaker factor "should prevail over all other factors a trial court may consider"). The circuit court was keenly aware that Rachel had served as the children's primary caregiver "during most of their lives[,]" but it determined that other factors favored placing custody of the children with Tim. Her accompanying claim that the court simply determined custody because Tim received interim custody of the children[6] and possession of the family's Rapid City home is, as detailed above, inconsistent with the court's careful consideration of the evidence.

---

6.     Rachel requests we review the circuit court's interim custody order on appeal, but we decline to do so. The court subsequently made a final custody determination based upon a fully developed trial record, rendering the issue moot. *See Netter v. Netter*, 2019 S.D. 60, ¶ 9, 935 N.W.2d 789, 791 (citation omitted) ("A moot case is one in which there is no real controversy or which seeks to determine an abstract question which does not rest on existing facts or rights, with the result that any judicial determination would have no practical or remedial effect.").

[¶32.]     Beyond this, Rachel's custody arguments reflect a determined effort to relitigate the evidence. Claims of Tim's faults, her virtues, and allegations of misconduct are all distinctly ill-suited for appellate review.

***Marital Property Determinations***

[¶33.]     In all divorce actions, SDCL 25-4-44 authorizes circuit courts to "make an equitable division of the property belonging to either or both [of the parties], whether the title to such property is in the name of the husband or the wife." "A circuit court has broad discretion in determining whether property is marital or non-marital." *Anderson v. Anderson*, 2015 S.D. 28, ¶ 6, 864 N.W.2d 10, 13-14. "Only where one spouse has made no or de minimis contributions to the acquisition or maintenance of an item of property and has no need for support, should a court set it aside as 'non-marital' property." *Id.* ¶ 6, 864 N.W.2d at 14 (quoting *Novak v. Novak*, 2006 S.D. 34, ¶ 5, 713 N.W.2d 551, 552-53); *accord Field v. Field*, 2020 S.D. 51, ¶ 18, 941 N.W.2d 221, 225.

[¶34.]     Rachel argues that the circuit court abused its discretion when it determined that Tim's Montana Police Officers' Retirement Pension (MPOR) was non-marital property. The court found that Tim's MPOR was "entirely premarital and Tim's separate property" because all of his service as a police officer—July 1, 1992 to September 30, 1999—preceded his marriage to Rachel, and he had "earned the right to his entire [pension] several years before his marriage." Rachel does not argue that she contributed in any way to the acquisition or maintenance of this asset. Nor has she argued or established that she is in financial need of this asset.

We therefore conclude that the court did not abuse its discretion in finding Tim's MPOR was non-marital property not subject to division.

[¶35.] Rachel's additional claim that Tim's FURS retirement should have been subject to equitable division overlooks the fact that the circuit court agreed and divided the benefit. Because the FURS retirement was partially earned prior to the parties' marriage, the circuit court accepted expert testimony from a certified valuation analyst who applied a coverture fraction to determine that Tim earned 61.83% of his FURS retirement during the marriage. This percentage also contemplated the repurchase of Tim's years of military service to increase this FURS benefit.[7] As a result, the court ordered that Rachel receive a monthly FURS retirement benefit of $799.83 for the length of Tim's remaining life expectancy, or 342 months. We can discern no abuse of discretion.

[¶36.] With regard to assets determined to be marital property, we have held that a circuit court must consider the following factors when equitably dividing marital property:

> (1) the duration of the marriage;
>
> (2) the value of the property owned by the parties;
>
> (3) the ages of the parties;
>
> (4) the health of the parties;
>
> (5) the competency of the parties to earn a living;
>
> (6) the contribution of each party to the accumulation of the property; and

---

7. The cost of repurchasing Tim's years of military service was $90,000 – $67,000 of which, the circuit court found, was financed from two retirement accounts Tim accumulated prior to the parties' marriage.

(7) the income-producing capacity of the parties' assets.

*Taylor*, 2019 S.D. 27, ¶ 16, 928 N.W.2d at 465 (quoting *Novak*, 2006 S.D. 34, ¶ 4, 713 N.W.2d at 552).

[¶37.] "This court does not 'sit as a trier of fact, and thus we will not attempt to place a valuation on any of the assets involved in the property settlement.'" *Id.* (quoting *Guindon v. Guindon*, 256 N.W.2d 894, 897 (S.D. 1977)). "Any 'doubts about whether the evidence supports the circuit court's findings of fact are to be resolved in favor of the successful party's version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action.'" *Id.* (quoting *MacKaben v. MacKaben*, 2015 S.D. 86, ¶ 20, 871 N.W.2d 617, 624).

[¶38.] Here, the circuit court's findings state that Rachel was 36 and Tim was 51 at the time of their divorce, had been married for 13 years, and were both in excellent health. The court concluded that "both earn substantial income in their own right" and "are equally competent to earn a living." The court also found that both parties equally contributed to the accumulation of the marital property and awarded them each equal shares of the marital estate.

[¶39.] Rachel's disagreements with the circuit court's marital property division largely center on her argument that the court erroneously accepted Tim's valuations of certain assets, including the businesses—Tim Evens Carpet Care, Inc. and Restoration Resource, LLC. However, as the court observed, "Rachel did not produce any expert testimony or any hard evidence regarding the current fair market value of the business interests." Furthermore, Tim's valuation evidence was presented by a certified valuation analyst whose analysis formed the basis for

expert testimony. Under the circumstances, we cannot say that the court abused its discretion by adopting the only valuation evidence available.[8]

[¶40.] Rachel further argues that the circuit court required her to pay all the household expenses during the interim divorce period from March 2018 to November 2018. This claim is at odds with the record and the court's determination that:

> Both parties generated income and incurred personal living expenses, expenses for the children and contributed to the payment of marital debts during the interim of this proceeding and the fact that the [court] is not going to require Rachel to pay interim child support have all been considered in the overall property distribution . . . .

We believe the court considered the parties' payments of obligations arising during the pretrial interim and conclude that Rachel has not established the factual premise of her claim. We will not consider it further.

***Child Support Calculation***

[¶41.] Child support obligations are calculated using "the combined monthly net incomes of both parents . . . divided proportionately between the parents based upon their respective net incomes." SDCL 25-7-6.2. "The trial court is required to calculate the parents' monthly net income, which is equal to gross income less allowable deductions, as codified at SDCL 25-7-6.3 and 25-7-6.7." *Midzak*, 2005 S.D. 58, ¶ 30, 697 N.W.2d at 740-41. "Deviations from the support obligations

---

8. At trial and on appeal, Rachel claims that she was not able to arrange for an appraisal of the parties' personal property because Tim would not allow her access to the former marital home. However, Rachel has not argued that the circuit court erred by refusing to grant her access or even that she made such a request.

schedule . . . must be raised by the parties in order to be considered by the trial court." *Id.*

[¶42.] Here, the circuit court's calculations correspond to these statutory standards. In its findings of fact and conclusions of law, the court properly calculated the parties' net incomes by including Tim's retirement and disability income[9], his business net income, Rachel's wages from her employment, and the amount of Tim's FURS retirement income it had awarded to Rachel. The court also deducted Rachel's 401k contribution and the cost of health insurance coverage for the children as required by statute. From these individual income figures, the court calculated the parties' combined net income, which totaled $15,318.18, and determined Tim's monthly net income of $8,881.36 accounted for 58% of the combined net income, and Rachel's monthly net income of $6,436.82 represented 42%. The court then calculated the combined child support obligation for four children, from SDCL 25-7-6.2, at $3,108. Rachel's share of this obligation, or 42% of $3,108, totaled $1,305.36. The court's deduction of $173.06 for her monthly health care insurance coverage for the children resulted in a monthly child support obligation in the amount of $1,132. In our view, the court correctly applied the statutory child support rules and did not abuse its discretion when it calculated Rachel's child support obligation.

---

9. Tim served on active duty in the United States Navy from 1986-1991. As a result of his service-connected disability rating, he receives monthly disability income from the Veterans Administration based upon a service-connected disability rating of $1,083.52.

[¶43.] Rachel, however, argues that the circuit court refused to grant her "amounts deductible by SDCL 25-7-6.6, SDCL 25-7-6.7, [and did not] verify[] Tim's income/deductions." The provisions of SDCL 25-7-6.6 govern income calculations where one parent derives income in the form of profits from a business, and it is unclear how the statute would apply to Rachel, whose income is paid by her employer in the form of wages. Further, the court used the authority of SDCL 25-7-6.7 to allow income deductions for both parties, including income taxes, social security and Medicare taxes, and Rachel's 401k contribution.[10] We see no error.

***Attorney Fees***

[¶44.] A circuit court's decision to award attorney fees in a divorce action is guided by the following two-step analysis:

> First, the court must determine what constitutes a reasonable attorney's fee. This requires consideration of: (1) the amount and value of the property involved; (2) the intricacy and importance of the litigation; (3) the labor and time involved; (4) the skill required to draw the pleadings and try the case; (5) the discovery utilized; (6) whether there were complicated legal problems; (7) the time required for the trial; and (8) whether briefs were required. Second, it must determine the necessity for such fee. That is, what portion of that fee, if any, should be allowed as costs to be paid by the opposing party. This requires consideration of the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case.

---

10. The circuit court also found that "while Rachel requested an award of money for [l]ost wages and money for something she labeled '[c]areer [c]hange,' Rachel did not seek alimony or spousal support." We agree. At trial, Rachel requested a cash credit of $25,000-$50,000 to allow her to obtain additional credentialing in order to renew her professional licensure. The court noted that Rachel's income could be reduced in the future, but it correctly concluded there was no request for alimony or spousal support.

*Green*, 2019 S.D. 5, ¶ 13, 922 N.W.2d at 288 (quoting *Streier v. Pike*, 2016 S.D. 71, ¶ 25, 886 N.W.2d 573, 581); *see also* SDCL 15-17-38 ("The court, if appropriate, in the interests of justice, may award payment of attorneys' fees in all cases of divorce").

[¶45.]    In its findings of fact and conclusions of law, the circuit court considered the relevant factors. The court stated that the case "involved extensive issues regarding custody of [the] children and complex property issues requiring expert testimony." The court also found that "[t]here were complicated legal problems created by Rachel to include asset valuation, Rachel's unwillingness to participate in the creation of a joint property exhibit, custody matters, parenting time matters, failure to exchange the children . . . [, and] Rachel being compelled to answer discovery." Issues were also complicated by Rachel retaining four attorneys, each of whom subsequently withdrew, and contesting "whether Tim had grounds for divorce." The court also noted that Rachel filed "a number of frivolous motions" and demanded "a number of needless hearings."

[¶46.]    The court ultimately ordered Rachel to pay $15,000 of Tim's $85,695.23 attorney fees request and $7,705.24 in costs and disbursements, both of which the court ordered to be deducted from Tim's cash equalization payment to Rachel. Given the court's extensive findings supporting its award of attorney fees, we conclude the court did not abuse its discretion.

***Contempt Findings***

[¶47.]    "The purpose of the civil contempt power is 'to force a party to comply with orders and decrees issued by a court in a civil action . . . .'" *Taylor*, 2019 S.D. 27, ¶ 39, 928 N.W.2d at 470-71 (quoting *Sazama v. State ex rel. Muilenberg*, 2007

S.D. 17, ¶ 23, 729 N.W.2d 335, 344). "The required elements for . . . civil contempt are: (1) the existence of an order; (2) knowledge of the order; (3) ability to comply with the order; and (4) willful or contumacious disobedience of the order." *Id.* (quoting *Keller v. Keller*, 2003 S.D. 36, ¶ 9, 660 N.W.2d 619, 622). "To form the basis for a subsequent finding of contempt, an order must state the details of compliance in such clear, specific and unambiguous terms that the person to whom it is directed will know exactly what duties or obligations are imposed upon her." *Id.* (quoting *Keller*, 2003 S.D. 36, ¶ 10, 660 N.W.2d at 623).

[¶48.] Here, each element of civil contempt is present. The circuit court found that Rachel had knowledge of the judgment and decree of divorce by virtue of its notice of entry and because Rachel admitted service of Tim's application for contempt and order to show cause. The judgment and decree's requirement to deliver a quitclaim deed and to sign and deliver various vehicle titles and 50% of the gold coins within 30 days was clear, and Rachel had the ability to comply with the order. In fact, she had delivered the quitclaim deed and title documents to the Pennington County Clerk but left them unsigned, contrary to the court's June 3 order conditionally granting her motion for a stay pending appeal.[11] The court further found Rachel's conduct to be willful and contumacious and afforded her a

---

11. Although she had essentially prevailed in her effort to obtain a stay, Rachel filed a pro-se appeal of the June 3 order, which we later dismissed. As relevant to the contempt discussion here, though, Rachel's statements to the circuit court in a June 18, 2019 email make it clear that she did not fail to sign the documents unintentionally. In her email, Rachel advised the court that she would "not be complying with your most recent order" because, in her view, it was "not even based on facts" and she "kn[e]w for a fact the Supreme Court will overturn the order."

means of purging her contempt. *See Hiller*, 2018 S.D. 74, ¶ 23, 919 N.W.2d at 555 ("[B]ecause of the overarching premium upon compliance, a court's determination of civil contempt must also include an opportunity for a recalcitrant contemnor to purge [her]self of [her] contempt by obeying the underlying order."). Based on our review, we conclude that the court did not commit clear error when it found Rachel in contempt for not complying with the judgment and decree.

***Appellate Attorney Fees***

[¶49.]     Rachel and Tim separately request appellate attorney fees and costs. Rachel seeks $19,467.52, and Tim requests $37,985.89. In our view, Rachel has unnecessarily complicated this appellate litigation. She has filed numerous motions with this Court during the pendency of the appeal, requesting modification of her child support, relief concerning responsibility for medical insurance, a change in custody, and a new trial.[12] In Rachel's most recent submission, she asked that we intervene to enjoin a pending protection order action Tim has commenced against her. She has argued in several motions that the circuit court has no jurisdiction until this appeal is resolved. However, Rachel's motions do not raise proper topics for a reviewing court. *See Reaser v. Reaser*, 2004 S.D. 116, ¶ 28, 688 N.W.2d 429, 438-39 (citations omitted) (explaining that further proceedings may occur at the circuit court level during the pendency of an appeal "when the subject matter of the appeal would not be affected by such proceedings" and would not "change or modify

---

12.     We have previously denied by separate order original motions for child support modification and relief concerning responsibility for medical insurance. The remaining motions and requests for relief Rachel filed during the pendency of this appeal are now each denied.

the judgment on appeal or have the effect of interfering with review of the judgment"). Under the circumstances and in light of our disposition in these consolidated appeals, we award Tim appellate attorney fees in the amount of $30,000.

## Conclusion

[¶50.] The circuit court's decision to grant Tim's request for a divorce on the grounds of extreme cruelty was not clearly erroneous. The court did not abuse its discretion in its child custody determination, marital property division, child support calculation, or award of attorney fees. Further, the court's order of contempt, based on Rachel's refusal to comply with its judgment and decree of divorce, was not clearly erroneous. We affirm.

[¶51.] GILBERTSON, Chief Justice, and KERN, JENSEN, and DEVANEY, Justices, concur.